Kevin WATSON and Raymond Wayne Thrash, Plaintiffs–Appellants,

v.

Odom GRAVES, Darryl Jarreau, Marilyn Jarreau, and Abe Ross, Defendants–Appellees.

No. 89–3899.

United States Court of Appeals, Fifth Circuit.

Sept. 13, 1990.

Roy M. Lilly, Jr., Stephen M. Irving, Baton Rouge, La., for plaintiffs-appellants.

A.S. Easterly, III, Easterly & Pittman, Denham Springs, La., for defendants-appellees Jarreau.

John R. Burgess, Burgess & Lee, Livingston, La., for defendants-appellees Graves and Ross.

Before REAVLEY, DUHÉ and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Kevin Watson (Watson) and Raymond Wayne Thrash (Thrash) (collectively, the Inmates), appeal the district court's grant of summary judgment in favor of all defendants based on that court's conclusion that as a matter of law, the Inmates are not employees of the private defendants under the Fair Labor Standards Act (FLSA or the Act), 29 U.S.C. §§ 201 *et seq.*, and are not entitled to relief under 42 U.S.C. § 1983 against the public defendants because their actions did not violate the thirteenth amendment or FLSA. We affirm the district court's holding that none of the defendants violated the thirteenth amendment. We reverse the district court's grant of summary judgment to the private defen-

dants based on its conclusion that the Inmates were not employees of those defendants for purposes of FLSA coverage; we render judgment for the Inmates on their FLSA claims against the private defendants; and we remand for the limited purpose of calculating the amount owed to the Inmates by the private defendants under the Act. We affirm the grant of summary judgment in favor of the public defendants on the FLSA issue.

## I.

After serving their respective sentences in the Livingston Parish Jail, Watson and Thrash filed this action against the Sheriff of Livingston Parish, the Warden of the Livingston Parish Jail (the public defendants), and Darryl and Marilyn Jarreau, owners of Jarreau Builders (the private defendants), claiming violations of various federal laws,[1] including FLSA and the thirteenth amendment. The Inmates filed a motion for summary judgment and the defendants filed a counter-motion for summary judgment. Following a hearing, the magistrate recommended that summary judgment be granted in favor of all defendants on all claims. The district court accepted the magistrate's recommendation. On appeal, the Inmates dropped all claims other than those based on the Fair Labor Standards Act and on the thirteenth amendment and 42 U.S.C. § 1983 claims.

## II.

Up to now this court believed, apparently naively, that in the last decade of the twentieth century scenarios such as the one now before us no longer occurred in county or parish jails of the rural south except in the imaginations of movie or television script writers. The egregious nature of this misanthropic situation in the instant case, however, disabuses us of that innocent misconception.

1. Appellants filed claims pursuant to (1) 42 U.S.C. §§ 1983, 1985, and 1986, based on violation of the fifth, eighth, thirteenth and fourteenth amendments, and 42 U.S.C. § 1994; (2) 18 U.S.C. § 1961, the civil RICO statute; and (3) 29 U.S.C. § 201 *et seq.*, for violation of the Fair Labor Standards Act.

In 1987, Watson and Thrash were incarcerated in the Livingston Parish Jail to serve sentences resulting from convictions in Louisiana state courts for commission of non-violent crimes. Neither inmate had been sentenced to hard labor. At all pertinent times, Odom Graves (the Sheriff) was the Sheriff of Livingston Parish and keeper of the parish jail. *See* La.Rev.Stat.Ann. § 15:704 (West 1981). Abe Ross (the Warden) was the warden of that jail.

During the time that Watson and Thrash were incarcerated, the Sheriff operated and the Warden administered a work release program for the Livingston Parish Jail. Under that program, prisoners who were granted trusty status were allowed to work outside the jail for private individuals or companies. When an outside party wanted trusty labor, such party would contact the Warden at the jail and he would assign the requested number of trusties to work for that party. Each trusty was paid $20.00 per day regardless of the nature of the work he performed, the hours he worked or his particular level of skill. That amount had been set by the Sheriff during one of his prior administrations.[2]

In September 1987, both Thrash and Watson were granted trusty status, then assigned to work for the Sheriff's daughter and son-in-law, Marilyn and Darryl Jarreau (the Jarreaus or Jarreau).[3] The Jarreaus operate an unincorporated construction business called Darryl Jarreau Builders. It listed only two employees, Darryl and Marilyn Jarreau, and otherwise used trusty labor or subcontractors.

Jarreau signed a "Livingston Parish Trusty Work Detail Agreement" each day he picked up trusties for work. The relevant terms of the agreement were that (1) Jarreau was responsible for the trusty's actions while they were in his custody; (2) the trusties could not go beyond the Livingston Parish line; (3) the trusties were not allowed access to drugs or alcohol; (4) trusties were not allowed to operate motor vehicles, machinery, or heavy equipment; (5) Jarreau had to provide transportation to and from the prison; (6) the trusties assigned were selected by the prison officials;[4] and (7) the trusties had to remain on the job site.

At times Jarreau picked up the Inmates as early as six in the morning and returned them as late as six to seven in the evening. No deputies or other law enforcement officers were present while the Inmates or other trusties worked for Jarreau. Neither deputies nor other law enforcement officers made either routine or "spot" checks or patrols of the job sites. Neither the jail nor Jarreau kept work records on Watson or Thrash, each of whom was paid directly for his day's work.[5] On at least one occasion, Watson used his own transportation while working for Jarreau. It appears that on other occasions jail personnel delivered one or both of the Inmates to the job site or picked them up from the job site as a favor to Jarreau.

### III.

This court reviews the grant of summary judgment motion de novo, using the same

---

2. La.Rev.Stat.Ann. § 15:711 (West 1981) specifies the only kind of work release program legally authorized for all parish prisons in the state (except those in Jefferson Davis Parish which has its own statutory work release program). The only inmates eligible for such a program are those convicted of non-violent crimes. *Id.* § 711(G). Section 15:711 mandates that wages of an inmate so employed "shall be not less than the customary wages for an employee performing similar services." *Id.* § 711(F). The Sheriff offered no justification for not following the wage mandate contained in section 711(F), but stated that he simply created his own program based in part on the one used in Jefferson Davis Parish, although

that program is only authorized for that one parish.

3. The Inmates were occasionally assigned to work for other individuals, but primarily were assigned to work for Jarreau.

4. Despite the provisions of the written agreement, there is evidence that trusties could be requested by name. Darryl Jarreau testified at deposition that after Watson asked to work for Jarreau, he placed Watson on the work crew for various projects.

5. Marilyn Jarreau testified by deposition that she paid cash to the trusties directly each day for the work they did for that day.

criteria used by the district court in the first instance. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988). We "review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party." *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (citing *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 873 (5th Cir.1984)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

## IV.

### Plaintiffs' Thirteenth Amendment Claims

The thirteenth amendment states:

Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the States, or any place subject to their jurisdiction.

U.S. Const.Amend. XIII, § 1. This court has held that the requirement that incarcerated prisoners work without pay does not constitute involuntary servitude in violation of the thirteenth amendment. *Wendt v. Lynaugh*, 841 F.2d 619, 620 (5th Cir.1988).

The Inmates argue that *Wendt* applies only to prisoners sentenced to hard labor, or those sentenced to work as part of their sentence. Watson and Thrash posit that, because they were not sentenced to hard labor, nor did the state demand work as part of their respective sentences, the holding in *Wendt* is inapplicable to them. Therefore, they argue, their case does not fall within the thirteenth amendment's exception for criminal punishment. They also argue that, because the work release program set up by the Sheriff violated La.Rev. Stat. § 15:711(F),[6] the program was itself not authorized by law. Therefore, it was illegal for the Inmates to be "put out to work."

We agree that a prisoner who is not sentenced to hard labor retains his thirteenth amendment rights; however, in order to prove a violation of the thirteenth amendment the prisoner must show he was subjected to involuntary servitude or slavery.

Involuntary servitude is defined as "an action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement." *United States v. Shackney*, 333 F.2d 475, 486 (2d Cir.1964). When the employee has a choice, even though it is a painful one, there is no involuntary servitude. *Id.* at 487. "A showing of compulsion is thus a prerequisite to proof of involuntary servitude." *Flood v. Kuhn*, 316 F.Supp. 271, 281 (D.C.N.Y.1970), *aff'd*, 443 F.2d 264 (2d Cir.1971), *aff'd on other grds.*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).

Watson and Thrash have proved no such compulsion. They argue that in a prison setting there are subtle and palpable tactics employed by jailors to intimidate the inmates and render seemingly voluntary conduct involuntary. None of the "facts" presented by Watson and Thrash show such intimidation. In fact, both testified that they requested work outside the jail and took work release whenever possible. The choice of whether to work outside of the jail for twenty dollars a day or remain inside the jail and earn nothing may have indeed been "painful" and quite possibly illegal under state law, but the evidence

---

**6.** Appellants claim the Livingston Parish work release program is illegal because it violates subsection (F) which requires inmates to be paid wages similar to those paid to other workers doing similar work. *See supra* note 2.

shows that neither Watson nor Thrash was forced to work or continued to work against his will. We conclude that, on the basis of their own testimony, neither Thrash nor Watson were subjected to involuntary servitude. Therefore, the district court correctly granted summary judgment to the defendants on the Inmates' thirteenth amendment claims.

## V.

### Fair Labor Standards Act Claim

Under FLSA, an " 'employee' is defined as 'any individual employed by an employer.' " *Alexander v. SARA*, 721 F.2d 149, 150 (5th Cir.1983) (quoting 29 U.S.C. § 203(e)(1)(1982)). An employer is "one who acts 'directly or indirectly in the interest of an employer in relation to an employee.' " *Young v. Cutter Biological*, 694 F.Supp. 651, 655 (D.Ariz.1988) (citing 29 U.S.C. § 203(d)). To "employ" is defined as including to "suffer or permit to work." *Id.* (citing 29 U.S.C. § 203(g)). For purposes of FLSA, determination of employee status focuses on economic reality and economic dependence. *Id.; see Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308 (5th Cir.), *cert. den.*, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); *see also* 29 U.S.C. § 206(a)(1). The "economic reality" test includes inquiries into:

> whether the alleged employer (1) has the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir.1984) (citing *Bonette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983)).

There are two distinctly different "inmate" situations that engender prisoners'

claims of FLSA coverage. The more common of the two involve outside, private, for-profit firms conducting operations within a prison (distinguished from a jail) and typically utilizing prisoners who have been sentenced to hard labor. In the majority of those situations, analysis under the economic reality test has led the courts to conclude that the inmates were not entitled to FLSA protection because primary control over the inmates, and determination of the hours to be worked and the nature of the work to be performed rested with the prison.[7] Under that analysis, the courts have found no employer-employee relationship existed. *See, e.g., Alexander*, 721 F.2d 149 (outside company had no contractual relationship with the inmates; compensation was paid to the State of Louisiana, not to inmates; no right on part of the company to select or reject an inmate assigned to work in the plasma program); *Hudgins v. Hart*, 323 F.Supp. 898 (E.D.La. 1971) (outside company had no contractual relationship with the inmates; prison officials assigned inmates to work for the company; compensation was sent to the prison, which determined the rate of pay); *Sims v. Parke Davis & Co.*, 334 F.Supp. 774 (E.D. Mich.), *aff'd*, 453 F.2d 1259 (6th Cir.1971) (no contractual relationship between inmates and private contractor; outside company relinquished right to determine manpower required, who would work and who would be discharged).

The second, less common inmate labor situation involves inmates working outside of the prison for and under the supervision of private contractors. In the leading case of *Carter v. Dutchess Comm. College*, 735 F.2d 8 (2d Cir.1984) the plaintiff was an inmate in the Fishkill Correctional Facility (FCF) and was employed outside of the prison as a teaching assistant at Dutchess Community College (DCC). After discovering that he was being paid at a rate lower than that of the "non-inmate" tutors, Carter sued DCC under section 1983 for viola-

---

7. We do not dispute that when a prisoner is sentenced to labor as part of his sentence, his labor belongs to the prison and is at the disposal of the prison officials. We draw a distinction however, between those prisoners who are sentenced to labor as part of their sentences and those who are not. In the latter case, there is no bar to a FLSA claim because the prisoner's work belongs to him and not to the prison.

tion of FLSA. The district court held that Carter retained his inmate status under the control of prison officials and, therefore, did not become an "employee" of DCC. *Id.* at 11. The district court also noted that "it was unlikely that Congress intended that the FLSA's minimum wage protection be extended to prisoners." *Id.*

The second circuit reversed,[8] stating that "we emphatically hold that the fact that [Carter] is a prison inmate does not foreclose his being considered an employee for purposes of the minimum wage provisions of FLSA." *Id.* at 15. Rejecting the idea that prison labor could never be covered under FLSA, the second circuit stated that the degree of control exercised by the prison officials is only one factor in determining employee status under FLSA. *Id.* at 13. Other factors to consider include the extent to which an employer exercises typical employer prerogatives over the inmate. *Id.* at 14.

The *Carter* court stated that in order to analyze an inmate's employee status the court must also look to the purposes behind the Act. The Act was drafted not only to improve living conditions, bargaining strength vis-a-vis employers, and the general well-being of the American worker, but also to eliminate unfair competition among employers competing for business in the market and among workers looking for jobs. *Id.* Furthermore, the category of prison inmate is not one of the groups Congress expressly excluded from coverage by FLSA. *See Id.* at 13. For the court to exempt an entire class of workers on the basis of a technical label could upset the desired equilibrium in the work place. *Id.* Therefore, the policies behind FSLA factor into the true economic reality of inmate labor outside of the prison.

■ We agree with the *Carter* court that status as an inmate does not foreclose inquiry into FLSA coverage. We also agree that in order to determine the true "economic reality" of the Inmates' employee status, we must apply the four factors of the economic realities test to the facts in the instant case in light of the policies behind FLSA. We must also look to the substantive realities of the relationship, not to mere forms or labels ascribed to the laborer by those who would avoid coverage.

## A.

### *Watson's and Thrash's employee status as to Jarreau*

■ The district court found that under the economic realities test, Watson and Thrash were not employees of Jarreau. The magistrate found, and the district court agreed, that (1) the prison officials made the decisions whether an inmate could become a trusty and perform work outside the prison; (2) the Sheriff determined the rate of pay; and (3) no employment records were kept on any of the prisoners by the Sheriff or the Jarreaus. On the basis of those findings, and in light of this court's reasoning in *Alexander,*[9] the district court found no material issue of fact. It held as a matter of law that Watson and Thrash did not have FLSA claims against the Jarreaus. We disagree.

Not only Watson and Thrash, but the Sheriff, Darryl Jarreau and Marilyn Jarreau all testified that during the times that Watson and Thrash worked for Jarreau they were unsupervised by any prison official, no patrols or spot checks were made at the work sites, and the inmates were supervised by the Jarreaus and no one else during the entire time the inmates were away from the jail. Jarreau kept the inmates for as long as he needed them, sometimes in excess of twelve hours. It is thus clear

---

**8.** The second circuit did not reach the ultimate issue of whether FLSA actually covered Carter, but remanded for further proceedings to determine if the facts of the case warranted FLSA coverage.

**9.** In *Alexander,* this court held that the relationship between SARA and the inmates had all of the characteristics of an employment relation-

ship, even though the agency had ultimate control over the inmate, but concluded that there was no employment relationship because in hard labor situations, the inmate's labor belonged to the prison and Congress did not contemplate FLSA being extended to prison inmates. *Alexander,* 721 F.2d at 150.

that Jarreau "supervised and controlled the 'employee' work schedules or conditions of employment." *See, e.g., Carter*, 735 F.2d at 12.

Jarreau also had the de facto power to hire and fire because he could request or reject particular inmates.[10] Technically, the Warden could overrule Jarreau and declare an inmate ineligible for work-release or proffer some inmate other than the one requested—we speculate that such rejection by the Warden would be quite unlikely considering that he worked for Jarreau's father-in-law. That technicality, however, does not change the realities of the situation; Jarreau not only determined which inmate would work for him, but also when, how frequently, how long, and on what projects the inmate would work, as well as what specific functions the inmate would perform. The facts at our disposal leave no doubt but that Jarreau had the de facto power to hire and fire. Therefore, two prongs of the economic reality test are satisfied. The third and fourth prongs require deeper analysis.

Technically, the Sheriff "set" the rate of pay for the Inmates,[11] albeit illegally under section 15:711. And it is undisputed that neither the Jarreaus, nor the Sheriff or the Warden kept any employment records whatsoever. Alone however, those superficial facts do not preclude application of FLSA to Watson and Thrash when we analyze the economic realities of the Inmate's employment in light of the policies behind FLSA.

Jarreau had at his disposal a "captive" pool of workers whom he had only to pay token wages. Those wages were well below the legal minimum, and, we speculate, even further below the "going rate" for workers with the Inmates' skills and abilities. Unlike his competitors, Jarreau incurred no expense for overtime, unemploy-ment insurance, social security, worker's compensation insurance, or other employee benefit plans because he had no "employees." Jarreau had no need to hire any non-inmate employees because his labor needs were in cheap and easy supply at his father-in-law's jail. Such a situation is fraught with the very problems that FLSA was drafted to prevent—grossly unfair competition among employers and employees alike.

Obviously, construction contractors in the area could not compete with Jarreau's prices because they had to pay at *least* minimum wage for even unskilled labor, not to mention all of the above listed overhead costs avoided by Jarreau. It takes little imagination to recognize that job opportunities for non-inmate workers in the area was severely distorted by the availability of twenty dollar per day workers from the parish jail.

This situation is unlike that in *Alexander, Hudgins,* and *Young* in which inmates who worked for private companies did so within the confines of the prison as a part of their sentence to hard labor. In those instances, the "hard time" inmates' labor did indeed "belong to the institution" and could be disposed of legitimately within the discretion of the correction facility or agency. *See Alexander*, 721 F.2d at 150; *Young*, 694 F.Supp. at 655; *Hudgins*, 323 F.Supp. at 899. In such situations, there is no need to "protect the standard of living and general well-being of the worker in American industry." *Alexander*, 721 F.2d at 150. Neither is there fear of "upsetting the desired equilibrium in the work place," because the "work place" was the prison itself. *See Carter*, 735 F.2d at 13. From that fact alone it is evident there was no unfair competition among workers in job markets outside the prison.

**10.** *See supra* note 4.

**11.** It is difficult for us to identify any one party as the one who "set" the rate of pay in this particular situation. The $20.00 a day amount was a flat rate for any inmate working at any job in the work release program. The "employer" of work release trusties did not have to negotiate the amount of pay because it was predetermined and indeed, it would have been foolish for him to haggle about paying such a de minimis amount. In addition, the Sheriff's "policy" is silent as to the method of payment; it seems that the method of pay was left to the discretion of the "employer." Therefore, no one really "set" a rate of pay as defined in the economic realities test.

By stark contrast, Watson and Thrash were not *required* to work as a part of their respective sentences.[12] Therefore, their labor did not "belong" to the Livingston Parish Jail and was not legitimately at the disposal of the Sheriff or the Warden. Consequently, the reasoning and the holdings in *Alexander, Young, Hudgins* and similar cases are inapposite.

Under a realistic analysis of the four prongs of the economic realities test, in light of the policies behind the Act, we find that when Watson and Thrash worked for the Jarreaus as part of the unauthorized Livingston Parish Jail work release program, they were "employees" of the Jarreaus for purposes of FLSA coverage. We therefore reverse the district court and render summary judgment for the Inmates on this issue. We also remand that portion of this case to the district court for calculation of the amount owed by the Jarreaus to Watson and Thrash under FLSA.[13] The Inmates are not entitled to punitive damages, but are entitled to any overtime pay due under FLSA, as well as any other payments applicable under the Act.[14] All costs of these proceedings and those in the district court are assessed against the appellees.

### B.

### *Watson's and Thrash's employment status as to Sheriff Graves and Warden Ross*

■ The Sheriff and the Warden argue that the Inmates have abandoned their claims of an employer-employee relationship with the Sheriff and the Warden. We agree.

The district court granted summary judgment in favor of the Sheriff and the Warden because the Inmates failed to ar-gue or present facts that would substantiate an employer-employee relationship between the Inmates and the Sheriff and Warden. The magistrate stated that the Inmates failed to present any evidence to show that there was a genuine issue of material fact as to the liability of the Sheriff or the Warden under FLSA. The district court adopted the magistrate's findings.

On appeal, Watson and Thrash continue to argue that the Sheriff and the Warden are liable to them under FLSA. But again, the record available to this court is devoid of any evidence, except a few conclusory statements, to support such claims. The Inmates point to no specific facts, other than that the Sheriff set the wage for inmate labor at twenty dollars per day, to show that an employment relationship existed between the Inmates and the Sheriff and Warden.

Watson and Thrash appear to argue that the Sheriff and Warden are somehow "joint employers" with the Jarreaus. Although the record is silent on the matter, it would follow logically that the Sheriff benefited vicariously in the knowledge of his daughter's and son-in-law's business advantages. For all we know he may have profited politically as well. But mere conclusory allegations and inferences are not sufficient to prove the required linkage. This court still must apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test. *See Young*, 694 F.Supp. at 655 n. 4 (citing 29 C.F.R. § 791.2(a)(1981)).

The inmates had ample opportunity to supply this court with facts necessary to determine whether they were employees of the Sheriff or the Warden, but failed to do

---

12. An inmate may be required to perform maintenance or upkeep work within the jail, but work-release is entirely voluntary. *See generally* La.Rev.Stat.Ann. § 15:708 and § 15:711.

13. This amount does not include the amounts already paid to the inmates as wages. The amount already earned will be subtracted from the amount owed by the Jarreaus to the inmates under FLSA.

14. We do not address Watson's and Thrash's claims for wages under La.Rev.Stat.Ann. § 15:711. Because the state cause of action was dismissed without prejudice by the district court, those claims are still viable and are not preempted by our holding in this case.

so.[15] We can reach no other conclusion but that the appellants abandoned their FLSA claim against the Sheriff and the Warden. Therefore, the district court's grant of summary judgment on that point is affirmed.

VI.

The work release program authorized in La.Rev.Stat.Ann. § 15:711 was meant to benefit inmates in Louisiana jails by allowing them to work outside the institution and earn wages with which to help support their families and pay their fines. It was also meant to benefit the citizens of Louisiana by permitting a portion of the wages earned by a work release inmate to be applied to his room and board, thereby easing the burden on the taxpayer. It is understandable that Watson and Thrash chose to work for the Jarreaus, thereby pleasing their jailers, getting away from the prison environment, and picking up pocket change for doing so, meager as it was. It is also true that their families received a modicum of cash while the Inmates were incarcerated. The Inmates' paltry earnings, however, constituted a relatively minor contribution to support of family or payment of fines, and did absolutely nothing for the taxpayer. That the direct beneficiaries of the Sheriff's unauthorized work release program were his daughter and son-in-law and the indirect beneficiary was the Sheriff himself is nothing short of disgraceful. It is disappointing to realize that such a situation can exist in this day and time—a situation in which the chief law enforcement officer of a parish located virtually in the shadow of Louisiana's capitol consciously disregards the only work release program statutorily authorized for his jurisdiction and in lieu thereof confects his own plan under which his relatives reap the benefits of inmate toil at a fraction of the minimum wage.

For the foregoing reasons, the judgment of the district court is affirmed in part,

reversed and rendered in part, and remanded for proceedings in conformity with this decision.

AFFIRMED in part, REVERSED and RENDERED in part, and REMANDED in part.

15. It is ironic that we are prohibited from applying FLSA standards to the Sheriff given that he may have profited as much or more than the Jarreaus in this situation; however, it is not our place to make the appellants' case for them.

Without facts sufficient to satisfy at even one factor of the economic realities test, we are prohibited from applying FLSA to the Sheriff and the Warden.