**Dinh T. CUSHMAN, Trustee, Plaintiff–Appellant,**

v.

**RESOLUTION TRUST COMPANY, as conservator of Commerce Savings Association, by the Federal Deposit Insurance Corporation, and manager for the Federal Savings & Loan Insurance Corporation, and Michael Blevins, Defendants–Appellees.**

No. 91–2183.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1992.

A. Randall Friday, Crady, Jewett & McCulley, Michelle M. Maynard, Houston, Tex., for plaintiff-appellant.

Leslie K. Amann, Houston, Tex., for defendants-appellees.

Before THORNBERRY, DAVIS, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this Texas diversity case, Plaintiff–Appellant Dinh T. Cushman, Trustee, (Mrs. Cushman) appeals the take nothing summary judgment granted by the district court in response to the motion therefor by the Defendants–Appellees (Defendants), as well as that court's award of costs and attorneys fees in favor of Defendants and the denial of the Mrs. Cushman's own motion for summary judgment. Agreeing with Mrs. Cushman for the reasons set forth below, we reverse the district court, rendering summary judgment in her favor and remanding for further proceedings consistent with this opinion.

## I.

### FACTS

A. *The Dash 3 Account*

On November 25, 1983, Mrs. Cushman and her then-husband, Jon Cushman (Mr. Cushman), purchased a $100,000 Certificate of Deposit, Account No. 50–008733–3 (the Dash 3 Account) from Commerce Savings Association (Commerce or the Bank). The account was labeled "Revocable Trust— Jon E. Cushman as Trustee or Dinh T. Cushman as Co–Trustee for Carolyn and Gene Cushman, Beneficiary". The face of the signature card for this account provided in pertinent part that the Cushmans:

hereby apply for a savings account in COMMERCE SAVINGS ASSOCIATION. A specimen of my (our) signature(s) is (are) shown below and you are hereby authorized to act without further inquiry in accordance with writings bearing any _____ of such signature(s). It is agreed that any funds placed in or added to this account by any of the undersigned, whether in his trustee or individual capacity, are and shall be conclusively intended to be a gift and delivery at that time of such funds to the trust estate.

The reverse side of the signature card provided in pertinent part:

The conditions of said trust are: 1) The trustee (co-trustees) is (are) authorized to hold, manage, pledge, invest and reinvest said funds at his (their) discretion; 2) The undersigned grantor(s) reserves the right to revoke said trust in part or in full at any time and partial or complete withdrawal by the original trustee (co-trustees) if he (they) is (are) the grantor(s) shall be a revocation by the grantor(s) to the extent of such withdrawal, but no other revocation shall be valid unless written notice is given to the association named on the reverse side of this card....

Mrs. Cushman alleges that just over a year later, on December 11, 1984, she and her husband returned to Commerce for the express purpose of changing the Dash 3 Account from an "or" account (requiring only one signature to effect transactions) to an "and" account (requiring the signatures of both Mr. and Mrs. Cushman). Although the Bank insists that it cannot find among its records the signature card evincing this change, Mrs. Cushman testified unequivocally that in June of 1987 an employee of Commerce gave her a copy of the revised signature card requiring both signatures.

In support of her first motion for summary judgment, Mrs. Cushman presented to the district court a copy of a signature card showing the intended change, and stating "A specimen of my (our) signature(s) is (are) shown below and you are hereby authorized to act without further inquiry in accordance with writings bearing any 2 of such signature(s)." The copy of the signature card includes, in handwriting,

the phrase "two signatures required" in the upper left corner. It also includes the typewritten phrase "Revised 12–11–84" in addition to a date handwritten in the appropriate space.

Mrs. Cushman's summary judgment evidence included copies of the Bank's periodic account statements for this Dash 3 account. Significantly, the statements issued before December 11, 1984, show the account as an "or" account, but account statements, as well as maturity notices and consolidated earnings statements, issued on and after December 31, 1984, show the account to be an "and" account, designating both of the Cushmans as trustees and Carolyn Cushman as beneficiary. The Bank's own file maintenance report, generated on December 12, 1984,—one day after Mrs. Cushman changed the designation on the Dash 3 Account—confirms that the Bank changed that account from an "or" account to an "and" account. Any purported dispute about this issue of fact certainly is not genuine.

Late in 1985, Mr. Cushman began borrowing money from Commerce. For loan number 070039599, which he last renewed in August of 1987, Mr. Cushman pledged the Dash 3 Account as security. The Bank never required Mrs. Cushman to sign the loan agreements, pledges or renewals. In fact, Mrs. Cushman's uncontroverted testimony shows that, until shortly before she filed suit against the Bank, she had no knowledge of her husband's borrowings from Commerce, much less of his purported pledge of the Dash 3 Account.

[Mrs. Cushman filed her original action against the Bank on September 24, 1987. Incredibly, but according to its own file maintenance report of October 6, 1987, the Bank then unilaterally changed the account back from an "and" account to an "or" account. That change was unsupported by any request or authorization from the Cushmans whatsoever.]

By February of 1987, Mr. Cushman had borrowed $89,364.39 from Commerce, at least partially on the strength of his purported pledge of the Dash 3 Account. That month—some five months *after* Mrs. Cushman brought suit against Commerce to rescind the pledge of the Dash 3 Account and restrain Commerce from applying the account against Mr. Cushman's debt—the Bank foreclosed on Mr. Cushman's pledge and applied $89,364.39 of the funds in the Dash 3 Account to Mr. Cushman's loan.

### B. *The Dash 4 Account*

On September 28, 1984 (roughly two and one half months before changing the Dash 3 account to an "and" account, and making their daughter its sole beneficiary), Mr. and Mrs. Cushman purchased a $50,000 Certificate of Deposit, No. 50–018878–4 (the Dash 4 Account), from Commerce. The certificate for this account was labeled "Jon E. and Dinh T. Cushman, trustees for Gene Cushman". The Bank does not dispute that this certificate of deposit was an "and" account from its inception.

Only one month later, however, Mr. Cushman purported to pledge the Dash 4 Account as collateral for another loan at Commerce, loan number 070035308, again without Mrs. Cushman's signature or knowledge. Some time after the Dash 4 Account was opened, presumably after Mr. Cushman's purported pledge, all of the funds were removed from this account without Mrs. Cushman's signature, authorization or knowledge. The Bank does not dispute that it permitted the funds to be withdrawn by Mr. Cushman on his signature alone despite the "and" nature of the account. The summary judgment evidence does not show the disposition of the withdrawn Dash 4 funds but, as that account had purportedly been pledged to cover Mr. Cushman's furtive borrowings from Commerce, we speculate that the funds were delivered to Commerce in repayment of his debt.

## II.

### PROCEDURAL HISTORY

On September 24, 1987, Mrs. Cushman, in her capacity as trustee, brought a suit against Commerce in the state district

court in Houston, Texas.[1] She claimed in her original petition and amended pleadings that funds in both the Dash 3 and Dash 4 Accounts were held in trust; that the signature cards governing the accounts required the signatures of both Mr. and Mrs. Cushman for withdrawal; and that Commerce and its Vice–President, Michael Blevins, who was later brought in as a defendant, had unlawfully withdrawn the funds or unlawfully allowed the funds to be withdrawn.

In March of 1989, Commerce and Blevins (the "Defendants") filed a third-party complaint against Mr. Cushman and a counterclaim against Mrs. Cushman.

Mrs. Cushman filed a motion for partial summary judgment, but because the Defendants disputed certain facts with respect to the status of the Dash 3 Account as an account requiring more than one signature, the state district court denied the motion.

Also in March of 1989, the Federal Savings and Loan Insurance Corporation (FSLIC) intervened through the Federal Deposit Insurance Corporation (FDIC) and was substituted for Commerce. FSLIC and FDIC removed the case to the federal district court. In December of 1990, the Resolution Trust Corporation (RTC) was substituted for Commerce.[2]

In August of 1989, Mrs. Cushman filed a second motion for partial summary judgment, alleging that the Dash 3 Account was a trust account that could not legally be pledged or applied to a co-trustee's personal debts and that defendants were liable for breach of trust as a matter of law. Mrs. Cushman also filed a motion for leave to amend her complaint asserting a new cause of action under the Texas Deceptive

Trade Practices Act (DTPA)[3]. On October 17, 1989, the district court denied both Mrs. Cushman's motion for partial summary judgment and her motion to amend her complaint to add a DTPA claim.

In December of 1990, Commerce and Blevins filed a motion for summary judgment. On February 5, 1991, the district court entered final judgment granting the Defendants' motion for summary judgment, denying Mrs. Cushman's motion for summary judgment, and awarding attorney's fees and costs to the Defendants. Mrs. Cushman timely appealed the district court's ruling.

### III.

### THE DISTRICT COURT'S OPINION

In its order of February 5, 1991, the district court recognized Mrs. Cushman's contention that she and Mr. Cushman had revised their signature card for the Dash 3 Account. Nevertheless, and inexplicably, the court stated, without citation or authority, that "*for purposes of this motion* the plaintiff *concedes* that the signature status of the account remained the same." (emphasis added). Maybe the court was referring to a statement Mrs. Cushman made in her second motion for summary judgment. As Mrs. Cushman's first motion for summary judgment had been denied based on factual disputes raised by the Defendants, we speculate that when she filed her second motion for summary judgment on the issue of the status of the accounts as trust accounts, she took care to avoid a repetition by stating

> Defendants disputed the authenticity of the "and" signature card. Defendants argued the account was an "or" account and Plaintiff's consent was not required

---

1. Mrs. Cushman's original petition asked the court for a temporary injunction to prevent the Bank from applying the proceeds of the Dash 3 Account to the loan. She later amended her complaint to include allegations of breach of contract, breach of obligation to pay instrument, violation of the Texas Savings and Loan Act, breach of trust, and conversion, and to request that she be awarded exemplary damages.

2. For the sake of convenience, we will continue to refer to the Bank or to Commerce, instead of the FDIC or the RTC.

3. Tex.Bus. & Comm.Code Ann. § 17.41 *et seq.* (Vernon 1987 and Supp.1991).

for withdrawal of the funds. Given this dispute, the state court denied Plaintiff's first motion. In this second motion, Plaintiff *assumes* the account was an "or" account. This assumption is made solely *for purposes of this motion.* (emphasis added).

Mrs. Cushman argued in her second motion for summary judgment that Commerce and Blevins were liable for breach of trust regardless of whether the account was an "and" or an "or" account. Her assumption regarding the signature card was unmistakably for the sake of argument only, not a "concession" as characterized by the district court.

The district court went on to find that the accounts were not trust accounts, that the funds in the account belonged beneficially to both Mr. and Mrs. Cushman, and that "[w]hen Mr. Cushman lawfully pledged the trust account as security for the loan, the legal and equitable title to the 'Trust' property and all equitable interest associated therewith became united in the Cushmans," thereby giving the Bank the right to offset the funds against indebtednesses owed to it by Mr. Cushman. The district court found further that even if the funds were held in trust for the benefit of a third party, "Commerce was entitled to a setoff because it detrimentally changed its position in reliance on Mr. Cushman's representation of ownership of the funds."

Presumably because it had declared that Mrs. Cushman "conceded" the issue of the change in signatory status of the Dash 3 Account, the district court disregarded Mrs. Cushman's summary judgment evidence, including the copy of the revised signature card and the Bank's statements, maturity notices and file maintenance reports showing that the account had been changed from an "or" account to an "and" account. The court also disregarded the facts that from its inception the Dash 4

Account had been an "and" account requiring two signatures, and that all funds in the Dash 4 account had been withdrawn by Mr. Cushman alone.

## IV.

## STANDARD OF REVIEW

This court reviews the grant of summary judgment motion *de novo,* using the same criteria used by the district court in the first instance.[4] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6] "Material facts" are "facts that might affect the outcome of the suit under the governing law."[7] When considering opposing motions for summary judgment, neither of which alleges a genuine issue of material fact, we are free to render judgment in favor of the party entitled to it as a matter of law.[8]

## V.

## ANALYSIS

### A. *The Signature Requirements*

■ The district court's order ignored Mrs. Cushman's evidence that the Dash 3 Account was an "and" account that required the signatures of both Mr. and Mrs. Cushman before funds could be withdrawn or otherwise alienated, as with a pledge. Again, regarding the Dash 3 Account, the district court misconstrued Mrs. Cushman's statement in her motion for summary judgment that she was assuming for the sake of argument that that account was an "or" account while contending that the funds

---

4. *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

5. Fed.R.Civ.P. 56(c).

6. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

7. *Id.*

8. *See, e.g., Grider v. Cavazos,* 911 F.2d 1158 (5th Cir.1990); *Watson v. Graves,* 909 F.2d 1549 (5th Cir.1990).

were trust funds whether or not the account was an "or" or an "and" account. The court incorrectly assumed, however, that the Dash 3 Account was an "or" account so that Mr. Cushman alone could "lawfully" pledge or withdraw funds. Moreover, the district court's order nowhere addressed the undisputed facts that the Dash 4 Account was an "and" account *ab initio* and that Mrs. Cushman never authorized the withdrawal of funds from that account. We conclude that the district court erred in ignoring Mrs. Cushman's summary judgment evidence concerning both accounts.

Mrs. Cushman's summary judgment evidence that the Dash 3 Account was changed to an "and" account long before any of the acts complained of occurred is overwhelming. She showed that on December 11, 1984, she and her husband went to Commerce to change the Dash 3 Account from an "or" account, requiring only one signature to effect transactions, to an "and" account, thenceforth requiring the signatures of both Mr. and Mrs. Cushman to effect transactions. Mrs. Cushman also showed that in June of 1987 an employee of Commerce gave her a copy of this revised signature card. This copy of a signature card, bearing the signatures of both Mr. and Mrs. Cushman, clearly indicates that thereafter two signatures would be required to effect any transaction. Mrs. Cushman submitted copies of account statements and consolidated earnings statements generated by the Bank for the Dash 3 Account. The statements issued before December 11, 1984, the date on which she and her husband changed the account, show the account to be an "or" account, but account statements and consolidated earnings statements issued from and after December 31, 1984, show the account to be an "and" account, listing the Cushmans as trustees for Carolyn Cushman. Even more revealing and compelling is the Bank's own file maintenance report, generated on December 12, 1984, only one day after Mrs. Cushman changed the designation on the Dash 3 Account. That report shows unequivocally that the account was changed—by the Bank on its own

records—from an "or" account to an "and" account. Furthermore, another of the Bank's own file maintenance reports, dated October 6, 1987, indicates that the Bank unilaterally and inexplicably changed the account from an "and" account back to an "or" account. It cannot be mere coincidence that this unilateral change was made by the Bank just two weeks after Mrs. Cushman filed her suit.

In response to all of that evidence, the Bank makes only the weakest of specious counter-arguments—that it has no record that the revised signature card was ever tendered to the Bank and the card cannot now be found in its records. This argument is facially disingenuous, especially when one considers that the Bank's signature cards are at all times under the exclusive control of the Bank itself. That the Bank continued to advance this argument through oral argument to this court approaches sanctionability. Without a scintilla of corroborating evidence, the Defendants make the conclusory statements that the revised signature card "contains indications that it may have been mailed or handed to Mrs. Cushman at Commerce's counter to be returned at a later date," and "the signature line contains an 'X', as if someone were indicating where to sign it." This conjecture is inadmissible as summary judgment evidence; but in any event it is woefully insufficient to overcome the overpowering character of Mrs. Cushman's evidence. We need only ask rhetorically, "if the Bank never had the revised signature card, how can it explain the changes in all of its internal records and reports?" We hold that whether the Dash 3 Account was changed from "or" to "and" presents no *genuine* issue of material fact.

B. *Applicable Texas Law*

Having determined that the district court erred in ignoring or misconstruing Mrs. Cushman's summary judgment evidence, we must consider the effect of that evidence on the court's legal conclusions.

In Texas, a depository contract, including a signature card, is a contract in writing

for all purposes.[9] "When a customer deposits funds with a bank, the bank impliedly agrees to disburse those funds only in accordance with the depositor's instructions."[10] Article 852a § 6.08 of the Texas Savings and Loan Act provides:

> When a savings account [11] is opened in any association operating under this law or Federal Savings and Loan Association doing business in this state in the names of two or more persons ..., if the savings contract provides that the signatures of more than one of such persons during their lifetimes or of more than one of their survivors after the death of any one of them are required on any check, receipt or withdrawal order, then the institution shall pay the monies in the account only in accordance with such instructions.[12]

■ The summary judgment evidence shows indisputably that the Dash 3 Account was converted from an "or" account to an "and" account well before the purported pledge. Thus, the revised signature card shows just as indisputably that two signatures were required to execute any writing. As for the Dash 4 Account, the Bank has never argued that it was anything but an "and" account from its inception. The transactions contemplated by the signature requirement include those transactions authorized by the "revocable trust agreement" on the reverse of the signature card, including "to hold, manage, pledge, invest and reinvest" the funds in the account. Therefore, by the time Mr. Cushman purported to pledge funds of either of the accounts, or to withdraw funds from the Dash 4 Account, Mrs. Cushman's signature was required. It is undisputed that the Bank never obtained Mrs. Cushman's signature for the pledges. The Bank also has presented no evidence that Mrs. Cushman signed for the withdrawal of the funds in the Dash 4 Account. The inescapable conclusion is that the Bank never bothered to require any signature but Mr. Cushman's for transactions on these two accounts, in direct contravention of the Texas banking laws and the depository contracts themselves.[13]

Certificates of deposit may be either negotiable or non-negotiable.[14] Because we find that other Texas law governs, we need not determine whether the certificates in question were negotiable. We do note, however, that the Texas statutes governing negotiable instruments also require the signature of both persons when the instrument is payable conjunctively to the order of two persons.[15] So, were we to find the subject certificates negotiable, we would also find that they were invalidly negotiated.[16]

9. Tex.Rev.Civ.Stat.Ann. art 342–701 (Vernon 1991).

10. *La Sara Grain Co. v. First Nat. Bank,* 673 S.W.2d 558, 564 (Tex.1984).

11. Tex.Rev.Civ.Stat.Ann. art. 852a § 1.03(13) (Vernon Supp.1991) defines a savings account as "the amount of money an association owes to an account holder as the result of the placement of funds in the association." Certificates of Deposit are savings accounts.

12. Tex.Rev.Civ.Stat.Ann. art. 852a § 6.08 (Vernon Supp.1991) (footnote added).

13. *Cf. Leinert v. Sabine National Bank,* 541 S.W.2d 872 (Tex.Civ.App.–Beaumont 1976). *Compare Blanchard v. Peoples Bank,* 844 F.2d 264 (5th Cir.1988).

14. Tex.Bus. & Com.Code Ann. § 3.103 (Vernon 1968); *See Southview Corp. v. Kleberg First Nat. Bank,* 512 S.W.2d 817 (Tex.Civ.App.—Corpus Christi 1974).

15. Tex.Bus. & Com.Code Ann. § 3.116 (Vernon 1968) provides that "[a]n instrument payable to the order of two or more persons ... if not in the alternative is payable to all of them and may be negotiated, discharged or enforced only by all of them." The comments to this section indicate that the "changes are intended to make clear the distinction between an instrument payable to 'A or B' and one payable to 'A and B.' ... The second is payable only to A and B together, and as provided in the original section both must indorse in order to negotiate the instrument, although one may of course be authorized to sign for the other." The Bank has presented no evidence that Mrs. Cushman authorized Mr. Cushman to sign for her.

16. The Bank argues that it was entitled to apply the Dash 3 Account to the loan because it is a holder in due course under Tex.Bus. & Com. Code § 3.302 (Vernon 1968). This argument is unavailing to the Bank because for it to be a holder in due course, the certificates of deposit must be negotiable instruments. Tex.Bus. & Com.Code § 3.102(a)(5) (Vernon 1968). As pre-

The Bank also contends that, pursuant to the depository agreement, it had the right to supply any endorsement for Mrs. Cushman required when the Accounts were pledged or their funds withdrawn. It relies on the following language found on both signature cards for the Dash 3 Account:

> You are authorized to supply any endorsement for me (us) on any check or other instrument tendered for this account and you are hereby relieved of any liability in connection with collection of such items which are handled by you without negligence, and you shall not be liable for acts of your agents, subagents, or others for any casualty.

We are not persuaded by the Bank's argument that this language allows it to supply the endorsement of a joint depositor of an "and" account for transactions of alienation, such as withdrawals or pledges, that reduce the balance or subject the account to potential forfeiture, or for any other transaction of that nature requiring a signature. Such a result would render nugatory all "and" accounts; yet "and" accounts are clearly contemplated by the Texas statutes. Moreover, the Bank's interpretation would render a portion of the depository agreement—that which requires multiple signatures—contradictory and unenforceable. Such a result simply makes no sense. Obviously, the quoted language is not intended to apply to withdrawals or pledges of account funds, but only to third party instruments *payable to* either or both account owners and submitted for deposit without endorsement of the payee.[17] The provision in question does nothing more than permit the Bank to affix signatures for incoming or enhancing instruments, as in the case of a "for deposit only" endorsement. In rejecting the Bank's reliance on its endorsement authorization, we note with bemusement that, while the Bank argues that it had authority to supply Mrs. Cushman's endorsement, it produced no summary judgment evidence

that it ever did so. The issue is thus academic.

█ The Bank also argues that the signature cards and status of the accounts do not control the relationship between the Cushmans and the Bank. Commerce reaches this conclusion by asserting that Mr. and Mrs. Cushman had beneficial ownership of the funds in the accounts because the accounts were not "true" trust accounts; that the funds were community funds; that the Bank was never on notice that the funds were separate funds; and that the loans represented community debt. Therefore, reasons the Bank, Mr. Cushman had the right to pledge the accounts as collateral for his own personal loans.

We disagree totally. Even if we accept, *arguendo*, the Bank's statements that the funds were community assets and the loans were community debts, the depository contracts and the nature of the accounts as joint accounts requiring both signatures must control. We find nothing in the jurisprudence or in the statutes that would lead us to conclude that the nature of the assets or debts as community is somehow incompatible with a multiple signature requirement on a deposit account. This is particularly true when the account is a trust account for the benefit of a named beneficiary, irrespective of the fact that a true, Texas Trust Code trust has not been created by a separate trust agreement. In fact, the Texas Savings and Loan Act provides that

> The pledge or hypothecation to any association or Federal association of all or part of a savings account issued in the names of two (2) or more persons signed by any person or persons upon whose signature or signatures withdrawals may be made from the account shall, *unless the terms of the savings account provide specifically to the contrary,* be a valid pledge and transfer to the institution of that part of the account pledged or hypothecated....[18]

---

viously discussed, it has not been determined that these certificates were negotiable instruments.

17. *See* Tex.Bus. & Com.Code § 4.205 (Vernon 1968).

18. Tex.Rev.Civ.Stat.Ann. art. 852a, § 6.10 (Vernon 1964) (emphasis added).

The terms of the Dash 3 and Dash 4 Accounts specifically provided that the signatures of both Mr. and Mrs. Cushman were required. Therefore, because the pledges were obtained without Mrs. Cushman's signature, they were ineffective.

■ The Texas Probate Code also supports Mrs. Cushman's contention that Mr. Cushman could not pledge or withdraw funds from the Dash 3 and Dash 4 Accounts without Mrs. Cushman's signature. Although § 444 provides that "a 'multiple party account' [19] may be paid, on request, to any one or more of the parties," [20] the term "request" is defined in § 436(12) of the Probate Code as:

> a *proper request for withdrawal,* or a check or order for payment, *which complies with all conditions of the account, including special requirements concerning necessary signatures* and regulations of the financial institution, but if the financial institution conditions withdrawal or payment on advance notice, for purposes of this part the request for withdrawal or payment is treated as effective and a notice of intent to withdraw is treated as a request for withdrawal.[21]

Consequently, to request a withdrawal from an account, the account holders and the Bank must comply with the terms of the account, expressly including the signature requirements. The withdrawal of the funds from the Dash 4 Account without Mrs. Cushman's signature was clearly improper, directly breaching the terms of the account contract. We recognize that the statutes quoted above do not speak directly to pledges. We are satisfied, however, that a pledge, if acted upon by a bank as did Commerce, is directly analogous to a withdrawal, making it subject to the §§ 444 and 436(12). A pledge, if foreclosed upon, has the effect of a withdrawal; to conclude otherwise would lead to an anomalous re-

sult: If Mr. Cushman, acting alone, had attempted to use the funds from the Dash 3 Account to pay his personal loan when it became due, the Bank could not lawfully have allowed him to do so. Surely, he cannot be allowed to circumvent the statutes and the account agreement to accomplish indirectly the result he is prohibited from accomplishing directly, simply by pledging the account without Mrs. Cushman's signature, in the certain knowledge that the Bank will foreclose the pledge to satisfy the loan.

C. *The Foreclosure*

■ The Defendants have steadfastly maintained throughout this proceeding that the Bank held a valid pledge, foreclosed the pledge properly, and applied the proceeds of the foreclosure of the Dash 3 Account to Mr. Cushman's personal loan in accordance with the terms of his loan contract. The Bank's assertions of its purported foreclosure and application of the proceeds of the foreclosure are supported by Blevins' deposition testimony. He deposed that he instructed his staff to cash certificates of deposit that had been pledged as security as soon as the loans on which they were pledged became past due. He referred to the certificates of deposit as "collateral," which they obviously were.[22] According to Blevins, when Mr. Cushman's loan became due, the Bank's staff cashed in the pledged CD and applied most of the funds in the Dash 3 Account to satisfy Mr. Cushman's loan.

Despite its insistence that it foreclosed on the pledged account, the Bank now attempts to rely on what it argues was its statutory right of offset.[23] Such convenient afterthought cannot be urged to make the silk purse of offset out of the pig's ear of the fatally flawed foreclosure. Thus, it is unnecessary for us to determine

---

**19.** Multiple party accounts include trust accounts as defined in Tex.Prob.Code Ann. § 436(14) (Vernon 1980).

**20.** Tex.Prob.Code Ann. § 444 (Vernon 1980).

**21.** *Id.* § 436(12) (emphasis added).

**22.** The Dash accounts were not mere book entries, but were corporialized in actual certifi-

cates of deposit. When asked, "And when that [loan deliquency] happened, did employees in the office take whatever security would be available to pay the loan?" Blevins answered, "Yes."

**23.** *See* Tex.Rev.Civ.Stat.Ann. art. 852a § 6.17 (Vernon 1964).

whether, in this instance, the Bank had a statutory right of offset against the Dash 3 Account because the Bank by its own admission never acted on any right other than that provided by the purported pledge itself—its right to foreclose on the Dash 3 Account. The Bank cannot now be heard to urge that if its foreclosures were ineffective because the pledges were invalid, just treat the foreclosures as though they were really exercises of the statutory right to offset. Even if the Bank could have exercised offset, it did not!

Simply put, because the Bank allowed Mr. Cushman to pledge the Dash 3 and Dash 4 Accounts without Mrs. Cushman's signature, the pledges were invalid. Because the pledges were invalid, the Bank's foreclosure of the pledge of the Dash 3 Account was equally invalid. Because the Bank allowed the funds in the Dash 4 Account to be withdrawn without Mrs. Cushman's signature, that withdrawal was improper. Because the Bank purported to foreclose the pledges, it cannot recast its flawed acts as exercise of a right of offset. And, because we find that at all relevant times both accounts were "and" accounts, it is unnecessary for us to determine whether the accounts contained money held in trust, whether the assets were community or separate assets, or whether the debts were community or separate debts.

### D. *Deceptive Trade Practices Act Claim*

■ In August of 1989, Mrs. Cushman filed with the district court a motion to add a claim under the DTPA, alleging that the Bank and Blevins violated the DTPA by permitting and accepting the pledge of the Dash 3 Account and applying the funds to Mr. Cushman's loan. The district court denied the motion without reasons. Mrs. Cushman argues that the district court abused its discretion when it denied the motion because in March of 1989 a Texas court of appeals ruled that a savings account depositor is a consumer of services

entitled to sue under the DTPA.[24] Mrs. Cushman did not assert a claim under the DTPA in her original pleadings because the law had not yet established that a savings account depositor is a "consumer" under the DTPA. The Bank nevertheless claims that Mrs. Cushman's DTPA claim is untimely because the DTPA provides that the action must be commenced

> within two years after the date on which the false, misleading, or deceptive act of practice occurred or within two years after the consumer discovered or in the exercise of reasonable due diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.[25]

Mrs. Cushman has stated that she first became aware of Mr. Cushman's pledge of the Dash 3 Account in June of 1987. She did not request leave to file her DTPA claim until August of 1989. Mrs. Cushman asserts, however, that her claim relates back to the date the original petition was filed. We agree. The Texas Civil Practice and Remedies Code § 16.068 states:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.[26]

Mrs. Cushman's DTPA claim arises out of the pledge and taking of the Dash 3 Account, some of the same transactions on which her original claims are based. Therefore, her DTPA claim is not based on a "new, distinct, or different transaction or occurrence."

■ The Defendants argue further that the court did not abuse its discretion in denying Mrs. Cushman's motion because

---

**24.** See *Plaza National Bank v. Walker*, 767 S.W.2d 276 (Tex.App.–Beaumont 1989).

**25.** Tex.Bus. & Com.Code Ann. § 17.565 (Vernon 1987).

**26.** Tex.Civ.Prac. & Rem.Code Ann. § 16.068 (Vernon 1986). *Cf.* Fed.R.Civ.P. 15(c).

she did not "give written notice . . . at least 60 days before filing suit." [27] They also assert that she failed to "plead and prove compliance with the notice provision." In response, Mrs. Cushman attached to her reply brief as Exhibit A copies of two letters, addressed to the Bank and to Blevins, dated August 29, 1988, in which she appears to have given notice of her intent to bring DTPA claims against them. The Bank then filed a motion with this court to strike Exhibit A on the grounds that this evidence is extraneous to the record and cannot be considered. Mrs. Cushman replied that there is no evidence in the record because the Bank never raised the question of lack of notice in its response to her motion for leave to amend. We hold that the Bank cannot at this late date assert that Mrs. Cushman failed to plead notice. In *HOW Ins. Co. v. Patriot Financial Services, Inc.*,[28] a Texas appellate court held that "the party seeking to deny recovery must point out the failure to plead or prove notice, or the complaint is waived." Because the Defendants declined to point out Mrs. Cushman's purported failure in its response to her motion, the Defendants will not be heard to do so now. Therefore, we deny the Bank's motion to strike Mrs. Cushman's Exhibit A.

We can see no reason in law why Mrs. Cushman should not have been allowed to file an amended complaint alleging DTPA violations based on the pledge and offset of the Dash 3 Account. We find, therefore, that the district court abused its discretion when it denied her leave to make that amendment.

### E. *The Blevins Claims*

Because the district court summarily dismissed Mrs. Cushman's claims, it never reached the issue of Blevins' liability. Therefore, on remand the district court must consider this issue if Mrs. Cushman chooses to prosecute her claims against Blevins.

### VI.

### CONCLUSION

We find no genuine issue of material fact. Mrs. Cushman did essentially all she could to protect the Dash 3 and Dash 4 Accounts. She entered into valid agreements with the Bank to require both her and her husband's signatures before a withdrawal, pledge, or any other disposition of the accounts or the funds could be made. The Bank cavalierly ignored its agreements with Mrs. Cushman and her husband when it (a) attempted to allow Mr. Cushman, alone, to pledge both accounts against his personal loans (if the Bank did not in fact insist on such collateral!); (b) took the money from one of the accounts by foreclosure to satisfy one of Mr. Cushman's personal loans; (c) allowed a total withdrawal of the funds in the other account to satisfy another of his loans; and (d) failed to seek Mrs. Cushman's authorization for any of these transactions. All of the Bank's acts and omissions were improper, or in contravention to the laws of Texas and the Bank's depository agreements with the Cushmans, or both.

For the foregoing reasons, we REVERSE the district court's judgment of February 5, 1991, insofar as it granted the Defendants' motion for summary judgment, denied Mrs. Cushman's motion for summary judgment, and awarded attorneys fees and costs to the RTC; RENDER summary judgment in favor of Mrs. Cushman as trustee against the RTC in the full amount of the funds improperly taken from the subject accounts, plus interest thereon from the dates of the improper conversion until paid; and REMAND this case to the district court for the limited purpose of determining (1) the precise quantum of damages, interest and costs (including attorneys fees) owed by RTC to Mrs. Cushman as trustee; (2) the liability of Defendant Blevins, if any, to Mrs. Cushman; (3) Mrs. Cushman's claims under the Texas

---

27. Tex.Bus. & Com.Code Ann. § 17.505(a) (Vernon 1987).

28. 786 S.W.2d 533, 537 (Tex.App.—Austin 1990).

DTPA; and (4) any other matters required to comply consistently with this opinion.