990 F.2d 131
 61 USLW 2644, 124 Lab.Cas. P 35,789,
1 Wage & Hour Cas.2d (BNA) 508
 David W. HARKER, Plaintiff-Appellant,
and
State Use Industry Envelope Shop Inmates; State Use
Industry Warehouse Inmate Workers; State Use Industry
Graphics Shop Inmate Workers; State Use Industry Jbruch &
Carton Shop Inmate Workers, Plaintiffs,
v.
STATE USE INDUSTRIES; Commissioner of Corrections; SUI
Regional Manager for Graphics; SUI Graphics Manager; SUI
Warehouse Manager; SUI Envelope Shop Manager; SUI Graphics
Shop-ECI; Louis Albert, Defendants-Appellees.
 No. 92-1296.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1993.
Decided March 24, 1993.
 
 H. Anthony Lehv, Student Atty., Appellate Advocacy Clinic, Washington, DC, argued (Jennifer P. Lyman, Adam G. Silverstein, Student Attys., on brief), for plaintiff-appellant.
 Lucy Adams Cardwell, Asst. Atty. Gen., Baltimore, MD, argued (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), for defendants-appellees.
 Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case presents the issue of whether inmates participating in prison work programs are covered by the Fair Labor Standards Act ("FLSA" or the "Act"). 29 U.S.C. § 201 et seq. Maryland inmate David W. Harker appeals the district court's dismissal of his suit, in which he and other inmates claimed to be entitled to the federal minimum wage for work performed at a prison workshop located within the penal facility. Because we find no indication that the FLSA applies, or was ever meant to apply, to such inmates, we affirm the dismissal of this lawsuit.
 
 I.
 
 2
 Appellant Harker is an inmate at the Maryland Correctional Institution at Jessup ("MCI-J"). Between 1986 and 1991, he worked in several capacities at the graphic print shop run by State Use Industries of Maryland ("SUI") at MCI-J. The print shop produced stationary, letterhead, and similar products. During that time, Harker did not receive the federal minimum wage or any overtime pay as provided for in the Act, 29 U.S.C. §§ 206-07, but was paid a lower wage determined by the Maryland Division of Corrections ("DOC") Commissioner and the General Manager of SUI. See Md.Ann.Code art. 27, § 681F.
 
 
 3
 In 1992, Harker sued SUI and various state defendants on behalf of himself and other inmates, alleging, among several claims, violations of the FLSA. SUI is an organization within the DOC created by the Maryland legislature to meet the rehabilitative needs of inmates. Id. at § 680. Specifically, SUI "[p]rovides meaningful work experiences for offenders intended to improve work habits, attitudes, and skills with the objective of improving the employability of the offender upon release." Id. at § 680(1)(iv). Toward this end, SUI operates several plants and service centers, such as the print shop at MCI-J. These operations produce goods and services for sale to government agencies, institutions, and political subdivisions of Maryland, as well as federal institutions and agencies, and those of other states. Id. at § 681C(a)(1). SUI may not sell its products on the open market except in very limited situations, such as sales to charitable or civic entities or when a surplus of goods remains unused after one year. Id. at § 681D. SUI does not generate a profit for the State, and by statute, is supposed to be financially self-supporting. Id. at § 680(1)(i).
 
 
 4
 Inmates fill all nonmanagerial positions within SUI, and SUI maximizes the rehabilitative value of the inmates' work experience by resembling a "private corporate entity as closely as possible." Id. at § 680(3). Inmates go through a voluntary application and interview process to participate in an SUI program. They work on a regular schedule, although shifts necessarily are shortened to accommodate lock-down schedules and security concerns. SUI may terminate participants in its programs, and although hourly wages are paid, they are set below the FLSA minimum. See id. at § 681F. Even with these parallels between SUI and an outside employer, the Maryland DOC ultimately administers all SUI programs and retains all authority necessary for the proper performance of DOC's statutory mission. Id. at §§ 681(4) and 681M.
 
 
 5
 After Harker and the other inmates filed their suit, the district court dismissed it under Fed.R.Civ.P. 12(h)(3) "for failure to state any arguable claim within the subject matter jurisdiction" of the court. This appeal followed. Only Harker gave notice of appeal, and he has abandoned his civil rights and Maryland common law claims.[1]II.
 
 
 6
 Harker argues that inmates participating in SUI programs must be paid the federal minimum wage because they meet the Act's circular definition of "employee," and are not exempted from the Act's coverage. Specifically, the FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an "employer" as "any person acting ... in the interest of an employer in relation to an employee." Id. at § 203(d). To "employ" means "to suffer or permit to work." Id. at § 203(g). After so widely defining its scope, the Act then exempts from coverage a long list of workers, ranging from executives to casual babysitters. See id. at § 213(a). According to Harker, because the definition of employee must be read broadly, see Tony & Susan Alamo Found. v. Secretary of Labor, 471 U.S. 290, 295-96, 105 S.Ct. 1953, 1958-59, 85 L.Ed.2d 278 (1985), and because the Act does not specifically exempt prisoners, the Act applies to participants in SUI programs.[2]
 
 
 7
 This argument fails. It presupposes that inmates in SUI-type programs should be considered employees for FLSA purposes in the first place. Even with a broad reading of this term, we see no indication that Congress provided FLSA coverage for inmates engaged in prison labor programs like the one in this case.
 
 
 8
 Initially, the labor being performed in SUI programs differs substantially from the traditional employment paradigm covered by the Act. Inmates perform work for SUI not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training. As a part of the DOC, SUI has a rehabilitative, rather than pecuniary, interest in Harker's labors. By producing useful goods in an atmosphere that mirrors the conditions of a true private employer, SUI helps prepare inmates for gainful employment upon release. DOC's effort to prepare inmates for eventual private employment, however, does not mean that inmates have achieved such a goal while still incarcerated.
 
 
 9
 SUI and the inmates also have not made the "bargained-for exchange of labor" for mutual economic gain that occurs in a true employer-employee relationship. Vanskike v. Peters, 974 F.2d 806, 809 (7th Cir.1992); Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320, 1325 (9th Cir.1991). They do not deal at arms' length; the inmates enroll in SUI programs solely at the prerogative of the DOC, which both initiates the programs and allows the inmates to participate. Because the inmates are involuntarily incarcerated, the DOC wields virtually absolute control over them to a degree simply not found in the free labor situation of true employment. Vanskike, 974 F.2d at 809-10. Inmates may voluntarily apply for SUI positions, but they certainly are not free to walk off the job site and look for other work. When a shift ends, inmates do not leave DOC supervision, but rather proceed to the next part of their regimented day. SUI and Harker do not enjoy the employer-employee relationship contemplated in the Act, but instead have a custodial relationship to which the Act's mandates do not apply.
 
 
 10
 Further, the FLSA does not cover these inmates because the statute itself states that Congress passed minimum wage standards in order to maintain a "standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). While incarcerated, inmates have no such needs because the DOC provides them with the food, shelter, and clothing that employees would have to purchase in a true employment situation. So long as the DOC provides for these needs, Harker can have no credible claim that inmates need a minimum wage to ensure their welfare and standard of living. See Vanskike, 974 F.2d at 810-11; Miller v. Dukakis, 961 F.2d 7, 9 (1st Cir.1992).III.
 
 
 11
 Harker nevertheless argues that the Act still applies here because of its second intended purpose--preventing unfair competition in commerce. See 29 U.S.C. § 202(a)(3). Harker maintains that because some SUI goods may reach the open market, through sales of surplus goods or sales to civic or charitable entities, see Md.Ann.Code art. 27, § 681D, SUI must pay the minimum wage to prevent it from having an unfair advantage over other producers of similar goods.
 
 
 12
 We are not persuaded that the limited ways in which SUI goods might enter the open market threaten fair competition. Even assuming, however, the viability of this threat, the FLSA still does not apply here because Congress has dealt more specifically with this problem through the Ashurst-Sumners Act. 18 U.S.C. §§ 1761-62. Ashurst-Sumners criminalizes the transport of prison-made goods in interstate commerce in precisely those situations in which prison labor threatens fair competition. See Kentucky Whip & Collar Co. v. Illinois Central R.R. Co., 299 U.S. 334, 351-52 & n. 19, 57 S.Ct. 277, 282-83 & n. 19, 81 L.Ed. 270 (1937).
 
 
 13
 Ashurst-Sumners' very existence undercuts Harker's argument. Congress passed Ashurst-Sumners in 1935 and the FLSA in 1938. Under Harker's interpretation, Congress would have passed the FLSA knowing that it made Ashurst-Sumners superfluous. What need would there be to criminalize the transport of prison-made goods if they did not enjoy the unfair economic advantage of being produced by cheap (non-FLSA) labor? Yet not only has Congress never repealed Ashurst-Sumners, it has periodically amended and recodified it. See Vanskike, 974 F.2d at 812.
 
 
 14
 Ashurst-Sumners also exempts from its coverage two situations that pose no threat to fair competition. Both exemptions conflict with Harker's position that the FLSA applies to his work for SUI. First, Ashurst-Sumners exempts prison-made goods, like SUI's, manufactured for use by federal, state, and local governments. 18 U.S.C. § 1761(b). Congress recognized here that governments have other uses for the fruits of prison labor besides the unfair maximizing of profits in the marketplace. Such uses could include rehabilitation efforts, such as Maryland's, or even using the savings accrued from prison labor to offset some of the costs of incarceration. See Vanskike, 974 F.2d at 811-12. Congress encourages such uses by legalizing the transport of prison-made goods when they are sold in the limited marketplace of governmental entities. Harker's position conflicts with this exemption, however, because he would require inmates to be paid minimum wage for producing governmental goods, even though Congress has concluded that such goods do not threaten fair competition.
 
 
 15
 Second, Ashurst-Sumners exempts the transport of goods produced under the Bureau of Justice Assistance's Private Sector/Prison Industry Enhancement Certification Program. 18 U.S.C. § 1761(c)(1). The Program requires that inmates be paid at least the prevailing local rate for their work, with the FLSA minimum wage as a floor. Id. at § 1761(c)(2); see also 50 Fed.Reg. 12661 (March 29, 1985). This exemption creates a quid pro quo that allows prison-made goods to enter the open market when manufacturers have paid inmates at least the minimum wage to ensure that no unfair competition occurs. Under Harker's interpretation of the FLSA, this Program would be altogether superfluous because the minimum wage already would be paid to inmates, thus eliminating any need for Congress to have ever offered a quid pro quo to manufacturers to avoid unfair competition.
 
 
 16
 Ashurst-Sumners' specific provisions deal with Harker's concerns more directly than the FLSA's general provisions. We must read the two statutes in pari materia, and it is axiomatic that, in this situation, the more specific statute must control. See Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2482-83, 41 L.Ed.2d 290 (1974). Ashurst-Sumners also has no private right of action, and therefore, Harker may not rely on it in this civil suit. Wentworth v. Solem, 548 F.2d 773, 775 (8th Cir.1977). Because of Ashurst-Sumners, however, Congress could never have intended the FLSA to apply to inmates in Harker's situation.
 
 IV.
 
 17
 Finally, the case law also supports the view that the FLSA's coverage does not extend to Harker. The courts have refused to apply the FLSA to work done by inmates behind prison walls for any type of prison-operated industry or for the prison itself. We agree with those courts holding categorically that such inmates are not covered by the Act. Vanskike, 974 F.2d at 808 ("courts have not extended the FLSA's definition of 'employee' to cover prisoners who are assigned to work within the prison walls for the prison"); Miller, 961 F.2d at 8 ("courts have uniformly denied FLSA and state minimum wage law coverage to convicts who work for the prisons in which they are inmates"); Worsley v. Lash, 421 F.Supp. 556 (N.D.Ind.1976) (holding that an inmate working as a trustee in the criminal detention ward of a state hospital was not an employee for purposes of the Act); Emory v. United States, 2 Cl.Ct. 579, 580 (1983) ("Prisoners are not employees, within the meaning of the [Act]"). Both Vanskike and Emory dealt with the situations of inmates working not just in the servicing or maintenance of their prisons, but in prison industries similar to SUI. Vanskike, 974 F.2d at 806, 811-12; Emory, 2 Cl.Ct. at 579 (involving the Federal Prison Industries program).
 
 
 18
 Harker would have us eschew a categorical approach in favor of a case-by-case application of an "economic reality" test to determine if inmates are employees. See Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961); Gilbreath, 931 F.2d at 1328 (observing that the test requires consideration of the totality of the work situation, including whether the alleged employer (1) hires and fires, (2) controls work schedules, (3) determines pay rates, and (4) maintains pay records). We believe that using this test in situations when an inmate works inside prison walls only encourages unnecessary litigation and invites confusion in an area of the law that should be quite clear.
 
 
 19
 Even when the economic reality test has been applied to inmates, courts have almost uniformly held that the Act does not cover prisoners working within the prison setting. Gilbreath, 931 F.2d at 1325-26, 1328-31 (holding that inmates working at a private plasma center inside prison were not covered by the Act); Alexander v. Sara, Inc., 721 F.2d 149, 150 (5th Cir.1983) (holding that inmates working at a private, profit-making laboratory inside prison were not covered by the Act); Sims v. Parke Davis & Co., 334 F.Supp. 774, 782 (E.D.Mich.1971) (holding that inmates working at a private drug clinic inside prison were not covered by the Act); Hudgins v. Hart, 323 F.Supp. 898, 899 (E.D.La.1971) (holding that an inmate working for a private employer inside prison was not an "employee" because the prison controlled the inmate's labor); Huntley v. Gunn Furniture Co., 79 F.Supp. 110, 113-16 (W.D.Mich.1948) (same). But see Hale v. Arizona, 967 F.2d 1356, reh'g en banc granted, 967 F.2d 1372 (9th Cir.1992); Carter v. Dutchess Community College, 735 F.2d 8 (2d Cir.1984) (holding that the FLSA might apply to an inmate working as a community college tutor for classes taught inside a prison). Significantly, in all of these cases, inmates performed work for private, outside employers even though their work was done within a penal facility. Even though the companies receiving the ultimate benefit of the work were engaged in commerce for a profit, these courts held that the inmates did not have to be paid minimum wage. Harker's case, of course, does not present even that wrinkle. In his prison job, he worked for the state itself.
 
 
 20
 The extraordinary circumstances necessary to trigger FLSA coverage of inmate labor were suggested in Watson v. Graves, 909 F.2d 1549 (5th Cir.1990). There, a corrupt Louisiana sheriff and warden hired out inmates housed at the parish jail to a construction company run by the sheriff's son-in-law. The company paid the inmates substantially less than the work release rate required by Louisiana statute. Id. at 1551. The facts were so egregious that the panel deciding the case was moved to write that it "naively" thought "scenarios such as the one now before us no longer occurred in county or parish jails of the rural south except in the imaginations of movie or television script writers." Id. at 1550. In finding that the FLSA applied, the panel emphasized that the labor took place outside the jail, and that it promoted unfair competition by giving the son-in-law's construction company a distinct commercial advantage. Id. at 1555. The court, however, took pains to distinguish situations, such as Harker's, when inmates work "legitimately within the discretion of the correction facility or agency," and when inmates perform work not in the competitive market, but in "the prison itself." Id.
 
 
 21
 Ruling for Harker in this case would result in an unprecedented expansion of FLSA coverage to inmates working within the prison setting. Such an extension on our part would be no small excursion into the arena of public policy. Forcing states to pay the minimum wage to every inmate involved in an SUI-type program would dramatically escalate costs and could well force correctional systems to curtail or terminate these programs altogether. We also will not judicially impose a new kind of employer-employee framework upon the DOC and its inmates under the guise of interpreting the FLSA's scope. For more than fifty years, Congress has operated on the assumption that the FLSA does not apply to inmate labor. If the FLSA's coverage is to extend within prison walls, Congress must say so, not the courts.
 
 V.
 
 22
 For the above reasons, the district court's dismissal of this suit is
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 Harker has appealed the dismissal of his claim under Maryland's statutory minimum wage law. See Md. Labor & Employment Code Ann. § 3-413. We affirm dismissal of this claim, however, because the Eleventh Amendment bars federal court review of pendent state claims against state agencies and officials. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117, 104 S.Ct. 900, 917, 79 L.Ed.2d 67 (1984)
 
 
 [2]
 Although the district court never reached the question of whether this action could be dismissed on the merits under Fed.R.Civ.P. 12(b)(6), it is not critical to our analysis whether we affirm on 12(h)(3) or 12(b)(6) grounds. The prevailing party below may, of course, argue before us any ground that supports the judgment. See Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970)