Larry GEORGE, Guy Lamers, Brian Rupiper, Larry Pippenger, Mike Thiele, Plaintiffs,

v.

BADGER STATE INDUSTRIES (BSI), State of Wisconsin, Patrick Fiedler, Department of Corrections (DOC), Steve Kronzer, Chris Faulhaber, Prison Industry Board (names of members unknown at this time), Tommy Thompson, Defendants.

No. 92–C–787–C.

United States District Court,
W.D. Wisconsin.

July 20, 1993.

Larry George, pro se.

Guy Lamers, pro se.

Brian Rupiper, pro se.

Larry Pippenger, pro se.

Mike Thiele, pro se.

David E. Hoel, Asst. Atty. Gen., Madison, WI, for defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

Plaintiffs are inmates who performed work in the Wisconsin Prison Industries program while incarcerated in state prison. They bring this civil action seeking minimum wages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. The case is before the court on defendants' motion for summary judgment. Defendants contend that the Fair Labor Standards Act does not apply to inmates who work in prison for a program run by the Department of Corrections. I conclude that defendants are correct and I will grant their motion.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.

2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). The opposing party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Id.* at 322, 106 S.Ct. at 2552.

I find from the parties' proposed findings of fact that the following material facts are not in dispute.

## FACTS

At all times relevant to this complaint, plaintiff George was incarcerated at the Waupun Correctional Institution and the Oshkosh Correctional Institution; plaintiff Lamers, Rupiper, Pippenger and Thiele were incarcerated at Oshkosh.

Defendant Tommy Thompson is the Governor of the State of Wisconsin. Defendant Fiedler is Secretary of the Department of Corrections. Defendant Kronzer is director of the Bureau of Correctional Enterprises; his responsibilities include managing prison inmate work programs such as those operated by the Prison Industries Section of the Bureau. Defendant Faulhaber is section chief of Prison Industries. The Prison Industries Board is an advisory and decision-making body which has various statutorily imposed duties affecting the operation of Prison Industries.

Wis.Stat. 303.01(1)(b) provides:

The department, with the approval of the prison industries board ... may establish industries for the employment of inmates in the state prisons.... The department shall fix the price of all products and services as near the market price as possible.

In the Prison Industries programs at Waupun and Oshkosh, work is performed exclusively by inmates. Department of Corrections civil service employees perform educational, supervisory, administrative and security functions for the programs.

Prison Industries markets products and services under the name Badger State Industries. Prison Industries operates a metal stamping shop at Waupun that produces motor vehicle and bicycle license plates. Motor vehicle license plates are distributed exclusively to the Wisconsin Department of Transportation, pursuant to Wis.Stat. § 341.12(2). Bicycle license plates are distributed exclusively to municipal governments. Prison Industries operates a laundry at Oshkosh. Laundry services are supplied only to state agencies, pursuant to Wis.Stat. § 303.-01(1)(d). The customers of the laundry services are the Department of Corrections, the Wisconsin Department of Health and Social Services and the University of Wisconsin System.

Plaintiff George worked in the Prison Industries metal stamping program at Waupun from December 1989 to March 1992. From April 1992 until the present he has worked in the laundry program at Oshkosh. The remaining plaintiffs worked in the Oshkosh laundry program during the following periods: plaintiff Lamers from November 1991 until August 1992; plaintiff Rupiper from August 1992 until January 1993; plaintiff Pippinger from August 1991 until the present; plaintiff Thiele from April 1992 until January 1993.

Many inmates come to the Wisconsin prison system with little or no work experience, minimal marketable skills and inadequate training and education. The underlying purpose of the Prison Industries programs, as described in Wis.Admin.Code § DOC 313.-01(1), is to assist in the rehabilitation of such inmates by providing inmates with the opportunity to acquire skills and form responsible

work habits so that they will be more readily employable upon release. To this end, Prison Industries attempts to simulate private business working conditions. These conditions include job applications, job interviews, probationary work periods, work schedules, punching a time clock, work rules, sick leave, work evaluations and promotion opportunities based on productivity. Inmates may be fired or demoted for work rule violations and deficient job performance.

Inmates are not compensated at the minimum wage rate currently set at $4.25 by the Fair Labor Standards Act, 29 U.S.C. § 206(a)(1). Instead, inmates are compensated pursuant to Wis.Stat. § 303.01(4), which states:

> All inmates shall be paid a wage which is based on the productivity of the work the inmates perform.... However, wages shall not be set at a rate such as to cause a deficit on operations....

Inmates receive compensation on a regular basis according to an established pay period schedule. Compensation takes the form of credits allocated to inmate accounts. These accounts are administered by the business office of the correctional institutions in which the particular inmate is housed. Prison Industries informs the institution business office by means of a printout how much compensation should be credited to the inmate's account.

Earnings are not disbursed automatically to inmates. Wis.Stat. § 303.01(8) provides:

> The department has the authority to determine how much, if any, of the earnings of an inmate may be spent and for what purposes they may be spent within the confines of the prison....

15% of all compensation received by inmates for Prison Industries work is applied to an inmate's release account until the account reaches $500.00. Wis.Admin.Code § DOC 396.366. In addition, compensation may be applied to victim-witness assessments imposed on the inmate by the sentencing court, as well as to support the inmate's family and in satisfaction of judgments of the inmate's creditors.

Inmates may not participate in a Prison Industries job unless the institution's Program Review Committee approves such participation as part of the inmate's program assignment. The committee may terminate an inmate's Prison Industries job by changing his program assignment, security classification or institutional placement. In addition, an inmate may be terminated for violation of a prison disciplinary rule.

Wis.Stat. § 303.01(6) provides that the primary goal of the Prison Industries program is to operate in a profitable manner. Prison Industries anticipates that by adhering to general business practices it will increase the likelihood that its programs will operate on a self-sufficient basis without subsidization by taxpayer funds, so as to provide work experience to the largest number of inmates possible.

Revenues from the sale of goods and services produced by Prison Industries are used to pay for materials, inmate labor, state employee labor and capital improvements required to sustain production. Revenues are also applied to debt service on any bonds issued under the authority of the legislature to finance the Prison Industries program. For the fiscal years 1988 through 1992, the Prison Industries metal stamping program generated net revenues of $2,661,927.

The operating budget of Prison Industries is prepared by the Department of Corrections and submitted to the Prison Industries Board for approval prior to submission to the Wisconsin Department of Administration and the Governor.

## OPINION

The Fair Labor Standards Act requires employers to pay employees a minimum hourly wage of $4.25. 29 U.S.C. § 206. The Act defines "employee" as "any individual employed by an employer." § 203(e)(1). The term employer includes a public agency. § 203(d). The Act defines the term "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g).

■ Prisoners are not categorically excluded from the minimum wage provisions of the Fair Labor Standards Act. *Vanskike v.*

*Peters,* 974 F.2d 806, 809 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1303, 122 L.Ed.2d 692 (1993). Courts look to the "economic reality" of the working relationship to determine whether an employer-employee relationship is established. *Id.* at 808. In most cases, courts apply the four-factor test established in *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983). Under *Bonnette,* courts are to look to "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* at 1470.

Notably, the majority of courts that have applied this test in the context of prisoners' performing work for private entities have declined to extend the minimum wage protections. *See, e.g., Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320 (9th Cir.1991) (prisoner working for private biological lab in prison is not an employee under FLSA); *Harker v. State Use Industries,* 990 F.2d 131, 135 (4th Cir.1993) (collecting cases and declining to apply *Bonnette* test when alleged employer is a state-structured prison industries program); *but see Carter v. Dutchess Community College,* 735 F.2d 8 (2d Cir.1984) (inmates who performed work as teaching assistants on behalf of a local community college at the prison may have a claim); *Watson v. Graves,* 909 F.2d 1549 (5th Cir. 1990) (prison labor for a construction company under a work-release program covered by Fair Labor Standards Act).

In *Vanskike,* 974 F.2d 806, the Court of Appeals for the Seventh Circuit declined to apply the *Bonnette* factors to prisoners working within the prison and for the prison. The court noted that although the *Bonnette* factors may be well-suited for determining whether an inmate working for a private employer is an "employee," the factors fail to capture the essentially penological nature of labor performed by prisoners for a prison. *Vanskike,* 974 F.2d at 810. The court reasoned that the *Bonnette* factors enable one to determine

> whether there is enough control over the individual to classify him as an employee. But here we are coming at the definition of "employee" from the opposite direction: there is obviously enough control over the prisoner; the problematic point is that there is too much control to classify the relationship as one of employment. The *Bonnette* factors thus primarily shed light on just one boundary of the definition of "employee," and we are concerned with a different boundary. Prisoners are essentially taken out of the national economy upon incarceration. When they are assigned work within the prison for purposes of training and rehabilitation, they have not contracted with the government to become its employees. Rather they are working as part of their sentences of incarceration.

*Id.* at 810. The court declined to extend the minimum wage protections to prisoners working in the prison and for the prison. *See also Harker,* 990 F.2d at 133 (same); *Hale v. Arizona,* 993 F.2d 1387 (9th Cir.1993) (adopting categorical approach of *Vanskike* and refusing to apply the Fair Labor Standard Act to inmates working for a state entity deemed a private enterprise by state law).[1]

In *Vanskike* the court noted that extending minimum wages to prisoners working for the state would not serve to advance the underlying purposes of the Fair Labor Standards Act, which are to preserve a minimum standard of living and prevent unfair competition. *Id.* at 810. The first concern is not implicated by prison labor because the prison provides prisoners their basic needs. *Id.* In addition, the threat of unfair competition posed by prison labor has been adequately addressed by the Ashurst–Sumners Act, 18 U.S.C. §§ 1761–62, which penalizes the introduction of prison-made goods in interstate commerce. The Act exempts from sanction any commodities manufactured for use by federal, state and local governments. *Id.* at

---

1. This en banc opinion reversed the panel decision in *Hale v. State of Arizona,* 967 F.2d 1356 (9th Cir.1992). To the extent plaintiffs rely on the earlier opinion, it no longer provides support for their case.

811. Thus, the use of prison labor by government does not pose a risk of unfair competition, but instead "may be seen as simply paying the costs of public goods—including the costs of incarceration." *Id.* at 812.

Plaintiffs attempt to distinguish *Vanskike* by arguing that it involved forced labor, whereas plaintiffs' labor is voluntary and is performed according to terms that prevail in the private market. It is true that in *Vanskike* the court emphasized the compulsory nature of the inmates' labor, distinguishing *Carter,* 735 F.2d 8, and *Watson,* 909 F.2d 1549, partly because in those cases the prisoners "were given the choice to work rather than being assigned to do so." *Id.* at 808.[2] Recently, in *Hale,* 993 F.2d 1387, the Ninth Circuit cited *Vanskike* for the proposition that the *Bonnette* factors are not a useful framework in the case of prisoners who work for a prison-structured program because they have to.[3] Nonetheless, the court's reasoning in *Vanskike* makes it clear that its categorical approach extends to so-called "voluntary" prison labor programs patterned after the private market. *See, e.g., Harker,* 990 F.2d at 132–133 (applying the reasoning of *Vanskike* to inmates who voluntarily enroll in state industries program). The crucial distinction between *Carter,* 735 F.2d 8, and *Watson,* 909 F.2d 1549, on the one hand, and *Vanskike,* 974 F.2d 806, on the other, lies in the fact that the former cases involved labor for an entity other than the state. Of central importance to the court's opinion in *Vanskike* was that the labor relationship at issue was but an extension of the penological one. Thus, the court indicated: "There is no indication that the Department of Corrections has a pecuniary, in contrast to a rehabilitative or penological, interest in inmate labor." *Id.* at 809. Whether the prison labor is compelled or voluntary, what matters is that the purpose of such labor is to further penological as opposed to economic ends. *See*

*also Harker,* 990 F.2d at 133. The *Bonnette* factors are not relevant to this analysis.

In this case, plaintiffs perform labor within the prison for Prison Industries, a program established by the Department of Corrections that is staffed by its civil employees and operated under its auspices to advance its statutory mission of rehabilitating inmates. Despite the parallels between Prison Industries and an outside employer, prisoners who perform labor remain within the matrix of prison control. This is reflected in the fact that the department determines the allocation of an inmate's earnings. Inmates who enroll in the program do so ultimately at the prerogative of the Department of Corrections' Program Review Committee. Thus, the labor relationship may be terminated for violating a prison disciplinary rule. All this is to say that labor performed in the prison for the prison or even for a separate state entity operated by the Department of Corrections is labor performed as part of a sentence of incarceration. The Court noted in *Harker:*

> Because inmates are involuntarily incarcerated, the DOC wields virtually absolute control over them to a degree simply not found in the free labor situation of true employment. *Vanskike,* 974 F.2d at 809–10. Inmates may voluntarily apply for SUI [State Use Industries] positions, but they certainly are not free to walk off the job site and look for other work. When a shift ends, inmates do not leave DOC supervision, but rather proceed to the next part of their regimented day.

990 F.2d at 133. The voluntary nature of the Prison Industries program does not manifest a bargained-for-exchange of labor. Instead, it reflects the program's emphasis on rehabilitative objectives as opposed to the punitive ones traditionally associated with forced labor in prisons. *See* Appendix, Note § DOC 313.01.

---

2. The court noted again the forced quality of the labor at issue in *Vanskike* in distinguishing the case from *Baker v. McNeil Island Corrections Ctr.,* 859 F.2d 124 (9th Cir.1988), a case that applied Title VII of the Civil Rights Act of 1964 to a prisoner working in a voluntary position.

3. In *Hale,* prisoners were required by Arizona statute to "engage in hard labor for not less than forty hours per week." Ariz.Rev.Stat. § 31–251(A). Roughly 20% of the prisoners worked for prison industries programs like the one in this case, including the plaintiffs, who worked in inmate-operated business enterprises.

The fact that Prison Industries generates net revenues according to a statutory mandate to operate at a profit does not alter the analysis. The objectives served by the Prison Industries program are penological, not pecuniary.[4] The Prison Industries programs are not designed to compete in the private sector. The program is required by statute to distribute goods at their market prices, Wis.Stat. § 303.01(1)(b), thereby offsetting the competitive advantage of a "cheaper" labor force. As the court noted in *Vanskike,*

> For the government, competition in the marketplace is not a dominant mode and profits are not the ultimate goal. A governmental advantage from the use of prisoner labor is not the same as a similar low-wage advantage on the part of a private entity: while the latter amounts to an unfair windfall, the former may be seen as simply paying the costs of public goods— including the costs of incarceration.. . .

974 F.2d at 811–812. In sum, the court's reasoning in *Vanskike* makes it plain that prisoners who perform labor in a state-structured prison program are not "employees" within the meaning of the Fair Labor Standards Act.

That the Fair Labor Standards Act does not apply to this case is bolstered by the fact that the goods produced by Prison Industries are distributed solely to other governmental agencies, including the University of Wisconsin and municipal governments. In these circumstances, the concern with unfair competition that underlies the Fair Labor Standards Act is not implicated. *Vanskike,* 974 F.2d at 811–812.

Accordingly, I conclude that plaintiffs are not entitled to the minimum wage protections of the Fair Labor Standards Act. Summary judgment will be granted in favor of defendants.

---

4. Plaintiffs argue that if the state were serious about enabling inmates to become self-supporting upon their release, they would pay inmates minimum wages so that upon release inmates would have some means with which to effect their reintegration into the community. This argument is not without merit. However, it is for the state to determine the manner in which the net revenues generated by Prison Industries can best effectuate the state's objectives.