**Larry GEORGE, Plaintiff,**

v.

**SC DATA CENTER, INC., Deneal Erickson, Michael Sullivan, Bureau of Correctional Enterprises, Defendants.**

**No. 94–C–0618–C.**

United States District Court,
W.D. Wisconsin.

May 2, 1995.

Larry George, Waupun, WI, pro se.

Michael H. Auen, Foley & Lardner, Madison, WI, for the Swiss Colony and SC Data Center, Inc.

David E. Hoel, Asst. Atty. Gen., Madison, WI, for Deneal Erickson, Michael Sullivan, and Bureau of Correctional Enterprises.

OPINION AND ORDER

CRABB, Chief Judge.

This civil action, brought pursuant to 42 U.S.C. § 1983 and the Fair Labor Standards Act, 29 U.S.C. § 216(b), is presently before the court on two motions for summary judgment: one from defendant SC Data Center, Inc., and the other from defendants Erickson, Sullivan and the Bureau of Correctional Enterprises. Because the proposed facts accompanying these two motions are largely identical, and since plaintiff has responded to both motions together, I will address them together. Plaintiff, a prisoner in the custody of the state of Wisconsin, claims that defendants violated the Fair Labor Standards Act by failing to pay him the minimum wage required under the act. 29 U.S.C. § 206(a)(1). Defendants' motions will be granted in full because plaintiff is not an "employee" as contemplated by the Fair Labor Standards Act.

For the purpose of deciding this motion, I find from the parties' proposed findings of fact that there is no genuine dispute over the following material facts.

UNDISPUTED FACTS

A. *Parties*

Plaintiff Larry George was at all times relevant to this action incarcerated at the Racine Correctional Institution in Sturtevant, Wisconsin. Defendant Deneal Erickson is the Industries Supervisor III and the supervisor of Prison Industries at Racine. Defendant Michael Sullivan is the Secretary of the Department of Corrections. Defendant Bureau of Correctional Enterprises is an agency of the Department of Corrections' Division of Program Services.

### B. *Bureau of Correctional Enterprises Activities at Racine*

Many inmates come to the Wisconsin Prison system with little or no work experience, minimal marketable job skills and inadequate training and education. These factors hamper inmates' efforts to obtain gainful employment upon release from prison. This makes it likely that they will not become productive citizens, will revert to criminal means of supporting themselves, and will be returned to prison on parole violations or new convictions. Without job skills, released inmates and their families are also likely to rely on public assistance for their support.

Prison Industries, which is managed by the Bureau of Correctional Enterprises, operates programs that provide inmates job experience, skills and an opportunity to form responsible work habits, making them more readily employable upon release. Prison Industries produces products and services marketed under the name Badger State Industries. Prison Industries operates a data entry work program for inmates at Racine. The data entry is performed on equipment owned and operated by Prison Industries. All data entry work by inmates is performed exclusively within Racine Correctional Institution, including data entry work performed pursuant to contracts with private business.

Revenues from the sale of goods and services produced by Prison Industries are applied to service debt on any bonds issued under the authority of the state legislature to finance Prison Industries programs. In this way it is anticipated that taxpayers will not be forced to bear the burden of supporting this inmate rehabilitation program. In fiscal year 1993–94 the Prison Industries data entry program at Racine Correctional operated at a gross loss of $121,000.

Bearing in mind institutional security concerns, Prison Industries attempts to simulate as closely as possible working conditions encountered in the private sector. For instance, inmates fill out job applications, are interviewed for their positions, are subject to a probationary work period, have defined work schedules, punch a time clock, follow work rules, are subject to performance evaluations and enjoy promotion opportunities based on productivity. Inmates are regularly compensated on the basis of an established pay period schedule, but they may be fired or demoted for work rule violations and deficient job performance. Conversely, data entry inmate workers may receive pay increases based on the speed and accuracy of their work.

Inmates seeking to participate in the data entry program must apply to the program, take a typing test and be interviewed by Prison Industries staff. However, an inmate may not participate in a Prison Industries job unless the institution's Program Review Committee approves such participation as part of the inmate's program assignment. The Program Review Committee may terminate an inmate's Prison Industries job by changing his program assignment, security classification, or institutional placement.

### C. *Plaintiff's Participation*

Badger State Industries and SC Data Center contracted on September 16, 1993 for data entry services at Racine Correctional to be performed during the fall and winter of 1993. Under the contract, SC Data Center sent Racine printed customer requests for catalogs from Swiss Colony, Inc. and customer orders for Swiss Colony, Inc. catalog sale products. Inmates in the Racine data entry work program were expected to enter this raw data into computers and save the data for further processing by The Bureau of Correctional Enterprises civil service employees at Racine Correctional. There was no separate contract between SC Data Center or any other business and Racine Correctional inmates for data entry services.

Plaintiff worked in the Racine Correctional data entry program, having been hired on October 18, 1993 and terminated on December 20, 1993. During this time period plaintiff worked on SC Data Center contract work. The money SC Data Center paid for data entry services went directly to Badger State Industries. The amount was set under the contract. SC Data Center had no control over the screening, hiring, firing, compensation or supervision of inmates. Nor did SC Data Center set work schedules, rules or conditions or provide security services for

the working inmates. These decisions and functions were made and conducted exclusively by Department of Corrections and Bureau of Correctional Enterprises employees. Data entered and stored by Racine Correctional inmates was further processed by the Bureau of Correctional Enterprises civil service employees into the final form specified by SC Data Center. The Bureau of Correctional Enterprises civil service employees also performed educational and administrative functions.

When plaintiff worked in the Prison Industries data entry program he was not compensated at the minimum wage rate set forth in the Fair Labor Standards Act, 29 U.S.C. § 206(a)(1). Plaintiff was compensated at the rate of one and one-half times his base rate for work performed in excess of eight hours per day. Inmate compensation takes the form of credits to inmate accounts, which are administered by the prison's business office. Compensation is applied to an inmate's release account so that state or other public agencies will not bear the cost of supporting the inmate upon his release. Compensation also may be applied to victim-witness assessments imposed on the inmate, as well as used to support the inmate's family and satisfy judgments of the inmate's creditors.

In sum, SC Data Center contracted with Badger State Industries for data processing results only, paid a fee only for items processed and was in no way involved in determining how inmate workers produced such results.

## OPINION

### A. *Summary Judgment Standard*

A party moving for summary judgment will prevail if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anetsberger v. Metropol-*

*itan Life Ins. Co.*, 14 F.3d 1226, 1230 (7th Cir.1994). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990). If the nonmovant fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### B. *Inmates Working For Private Entities*

■ The Fair Labor Standards Act requires employers to pay employees a minimum hourly wage of $4.25. 29 U.S.C. § 206(a)(1). The Supreme Court has instructed courts to interpret the term "employee" in the FLSA expansively. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326–28, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992). Nevertheless, courts have been reluctant to include prisoner-laborers in the definition of "employees" under the FLSA. *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir.1992); *Henthorn v. Department of Navy*, 29 F.3d 682, 685 (D.C.Cir.1994).

The Court of Appeals for the Seventh Circuit addressed the applicability of the Fair Labor Standards Act to prison labor in *Vanskike v. Peters*. In that case, a prisoner compelled to work various jobs for the Illinois Department of Corrections sought minimum wages pursuant to the Act.[1] The court "examin[ed] the 'economic reality' of the working relationship," and declined to extend the Fair Labor Standards Act's definition of "employee" to include "prisoners who are assigned to work within the prison walls for the prison." *Vanskike*, 974 F.2d at 808–09. The court reasoned that the Fair Labor Standards Act did not apply because the purpose behind the employment was rehabili-

---

1. In *Vanskike*, the court was unable to determine whether plaintiff's work produced goods for distribution outside his prison. *Id.* at 811. The most comprehensive description of Vanskike's

tasks amounted to labor "as a janitor, kitchen worker, gallery worker, and 'knit shop piece-line worker' while incarcerated at Stateville and Menard Correctional Centers." *Id.* at 806.

tative rather than pecuniary. *Id.* at 809–810. Further, the court noted that prisoners' work for the prison does not implicate the two underlying goals of the Fair Labor Standards Act: ensuring a minimum standard of living and preventing unfair competition. A prisoner's standard of living is established by state policy and the goods produced by prison labor are not for distribution outside the prison. The court of appeals rejected the argument that any unfair competition concern was raised by the production of goods for use by the government, including the production of license plates. *Id.* at 811.

This court examined these issues more recently in a case intimately familiar to plaintiff. In *George v. Badger State Industries,* 827 F.Supp. 584 (W.D.Wis.1993) (*"George I"*), inmates (including plaintiff) brought an unsuccessful action seeking minimum wages under the Fair Labor Standards Act for work performed in the Wisconsin Prison Industries program. Plaintiffs in *George I* worked either in a prison industries program metal stamp shop where motor vehicle license plates were manufactured or a laundry that served the Department of Corrections, the Wisconsin Department of Health and Social Services and the University of Wisconsin System. *Id.* at 585. The programs in that case served the penological objectives of providing inmates with the opportunity to acquire job skills, positive work habits and to increase their likelihood of employment upon release. *Id.* at 585–86. The goods and services produced through the program were distributed solely to other governmental agencies, including the University of Wisconsin and municipal governments. *Id.* at 589. After examining the "economic reality" of the working relationship, I declined to find an employer-employee relationship as envisioned by the Fair Labor Standards Act, *id.* at 587–89, finding that the goals of the Fair Labor Standards Act would not be frustrated by having goods produced by prison labor for wages below the minimum set by the Act when the goods are consumed strictly by other governmental entities. *Id.* at 589.

Courts in other jurisdictions have addressed the applicability of the FLSA to prison labor. There is general agreement that the "economic reality" test is the appropriate benchmark for determining the existence of an employment relationship. *Vanskike,* 974 F.2d at 808; *Henthorn,* 29 F.3d at 686; *McMaster v. State of Minnesota,* 30 F.3d 976, 980 (8th Cir.1994); *Hale v. State of Arizona,* 993 F.2d 1387, 1393 (9th Cir.1993) (en banc) (citing *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936–37, 6 L.Ed.2d 100 (1961)). In many cases, courts apply the four-factor test established in *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983) to determine whether an employer-employee relationship is established. Under *Bonnette,* courts are to look to "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* at 1470.

A quick examination of these factors makes it clear that the private defendant SC Data Central simply cannot be said to have an employer-employee relationship with plaintiff. Plaintiff was not hired or terminated by SC Data Central. Nor were his pay, working conditions or work schedule determined by SC Data Center, and SC Data Center kept no records of plaintiff's individual work or performance. Plaintiff has not suggested any additional criteria to aid this examination, and I can think of none that would compel a finding of an employer-employee relationship.

### C. *State Defendants*

█ Whether plaintiff is an "employee" of defendants Erickson, Sullivan or the Bureau of Correctional Enterprises is a more complicated issue. In *Vanskike,* 974 F.2d at 807–09, the court of appeals declined to apply the *Bonnette* factors to prisoners working within the prison and for the prison. The court noted that although the *Bonnette* factors may be well-suited for determining whether an inmate working for a private employer is an "employee," the factors fail to capture the essentially penological nature of labor performed by prisoners for a prison. *Id.* at 809. Other circuits have followed the Seventh Circuit in rejecting the *Bonnette* factors in the

context of prisoners working in prison-structured programs. *See Hale,* 993 F.2d at 1394; *Henthorn,* 29 F.3d at 686; *Franks v. Oklahoma State Industries,* 7 F.3d 971, 973 (10th Cir.1993). In place of those factors, courts still examine the "economic reality" of the relationship and ask if the prisoner may plausibly be said to be "employed" in the relevant sense. *Vanskike,* 974 F.2d at 809; *Hale,* 993 F.2d at 1394; *Henthorn,* 29 F.3d at 686 (proper inquiry is whether relationship between inmate and putative employer bears indicia of traditional employment).

I cannot conclude that plaintiff's relationship with the Bureau of Correctional Enterprises is best described as that of an employee. Rather, the Bureau of Correctional Enterprises plays a rehabilitative function as part of the Department of Corrections's role as custodian. I see no indication that the Bureau of Correctional Enterprises and plaintiff could be said to have arrived at a "bargained-for exchange of labor for consideration." *Vanskike,* 974 F.2d at 809. The Prison Industries section operates a rehabilitative program that provides a setting conducive to fostering productive work habits and skills. Nothing in plaintiff's submissions sways me from the conclusion that, as was the situation in *Vanskike,* the Department of Corrections exercised nearly total control over the plaintiff and control over his work environment was merely incidental. *Id.*

The principal distinction between plaintiff's situation and the facts in *Vanskike* and *George I* is that plaintiff's labors in this case benefitted a private corporation operating for profit. In his complaint, plaintiff alleges that the *sole* motive of each defendant was pecuniary and that cheap prison labor such as his own takes work away from non-incarcerated private citizens to whom minimum wage requirements would apply. Through these allegations plaintiff attempts to distinguish his

case by describing conditions that would frustrate one of the goals of the Fair Labor Standards Act, the prevention of unfair competition.

Other courts have resoundingly rejected the notion that this line of argument requires treating prison laborers as "employees" for the purposes of the Fair Labor Standards Act. Two principal purposes underlie the FLSA. The primary purpose, to alleviate labor conditions that are "detrimental to the minimum standard of living necessary for health, efficiency and well being of workers," 29 U.S.C. § 202(a), has no practical application in the context of prison work because an inmate's minimum standard of living is established by state policy.[2] *Vanskike,* 974 F.2d at 810; *Hale,* 993 F.2d at 1396; *Harker v. State Use Industries,* 990 F.2d 131, 133 (4th Cir.1993); *McMaster,* 30 F.3d at 980. The second purpose, to prevent unfair competition in commerce, 29 U.S.C. § 202(a)(3), poses a tougher question where the fruits of prison labor are enjoyed by private enterprise. This secondary purpose of the Fair Labor Standards Act is, however, ultimately unavailing to plaintiff's efforts to cast himself as an "employee" under the act. That the goal of preventing unfair competition is subordinate to the concern for the conditions of labor under the FLSA has long been recognized:

> In this Act, the primary purpose of Congress was not to regulate interstate commerce as such. It was to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation. It sought to raise living standards without substantially curtailing employment or earning power.

*Hale,* 993 F.2d at 1396 (quoting *Powell v. United States Cartridge Co.,* 339 U.S. 497, 509–10, 70 S.Ct. 755, 762–63, 94 L.Ed. 1017 (1950)). Furthermore, Congress has ad-

---

2. 29 U.S.C. § 202(a) declares:

(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread

and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair market of goods in commerce. . . .

dressed the problem of unfair competition by regulating prison-made goods in the Ashurst–Sumners Act, 18 U.S.C. §§ 1661–62.[3] The Seventh Circuit has concluded that the Ashurst–Sumners Act supports the conclusion that Congress did not intend the Fair Labor Standards Act's definition of "employee" to encompass prisoners working in prison:

> The Ashurst–Sumners Act was enacted in 1935–just three years before the enactment of the FLSA. It is difficult to imagine that Congress would have enacted legislation in 1938 that rendered its recently passed prison-goods law essentially superfluous (for the FLSA, so construed, would have addressed the problem of unfair competition from cheaply made prison goods by eliminating the low-labor-cost advantage). Even if one could plausibly accept this scenario, it is harder to hypothesize why, assuming the FLSA was intended to cover prisoners, Congress continued to make several minor amendments to and to recodify the Ashurst–Sumners Act over the years.

*Vanskike,* 974 F.2d at 812; *see also Hale,* 993 F.2d at 1397–98; *McMaster,* 30 F.3d at 980.

Although *Vanskike* addressed prison labor performed for the prison rather than labor performed for the benefit of private enterprise, the reasoning is applicable to the present case. Therefore, I hold that where remuneration for an inmate's labor is set and paid by his or her custodian, that prisoner is barred from asserting a claim under the Fair Labor Standards Act because such an inmate is not an "employee" under that act. *See Henthorn,* 29 F.3d at 686–87 (where the inmate's labor is set and paid for by his custodian, no cause of action exists under the FLSA because he is not an "employee"). Accordingly, summary judgment will be granted to all defendants.

### ORDER

IT IS ORDERED that the motions for summary judgment by defendants SC Data Center, Inc. and by Deneal Erickson, Michael Sullivan and the Bureau of Correctional Enterprises are GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

---

3. 18 U.S.C. § 1761(a) provides:

(a) Whoever knowingly transports in interstate commerce or from any foreign country into the United States any goods, wares, or merchandise manufactured, produced, or mined, wholly or in part by convicts or prisoners, except convicts or prisoners on parole, supervised release, or probation, or in any penal or reformatory institution, shall be fined not more than $1,000 or imprisoned not more than one year, or both.