DECISION
There is a prison in Rhode Island called the Adult Correctional Institution, or the ACI for short. Some of the prisoners in the ACI have prison jobs. Some work at jobs in the private economy on work release. Others work for various agencies or departments of the State, the defendant in this case, outside the prison. It is this last group which is the subject of this case.
These prisoners who have jobs in the various agencies and departments of state government sometimes do work which is usually done by state workers. These state workers are represented by a collective bargaining representative, or union for short, known as Rhode Island Council 94, AFSCME, AFL-CIO, the plaintiff in this case.
In this case the union asks the Court to confirm, and the State asks it to vacate, an arbitrator's decision that the State violated the collective bargaining agreement (CBA) between the State and the union when the State used prisoners to do work usually done by workers represented by the union.
The parties to this dispute agree on the pertinent law. An arbitration award will be confirmed if it "draws its essence" from the contract and is based on a "passably plausible" construction of the contract. The arbitrator applies "the common law of the work place" to the dispute. The award will be upheld even if the arbitrator commits an error of law, so long as the law is not "manifestly" disregarded. Courts are admonished to be mindful that the parties have selected arbitration as part of their on-going collective bargaining procedure, in which courts are ill-equipped to intervene.
On the other hand, arbitrators cannot exceed even the broad, almost borderless, power they enjoy in resolving collective bargaining disputes. They are not permitted to reach an utterly irrational result. They may not create an illegal contract between the parties. Their awards cannot violate a clearly-defined public policy. For all of these reasons, a court must vacate such an award. There are, of course, some other reasons, not raised in this case, for vacating an arbitrator's award.
Both sides claim the pertinent language in the CBA is plain and unambiguous. Each side argues, however, that this plain and ambiguous language means something different.
The first such provision is paragraph 38.1:
 "Work normally performed within an established bargaining unit shall not be performed by any employee outside said bargaining unit, except in an emergency situation."
Some of the language in this paragraph, while not ambiguous, is certainly not plain. "An established bargaining unit" are words of art referring to a group of job positions or classifications for whom a particular union has been recognized by the law as an exclusive collective bargaining representative. "Performed within" means performed by people in the jobs included in that group. "Outside said bargaining unit" is simply the opposite of "within an established bargaining unit." It is clearly implied in this case that none of the prisoners involved are "within an established bargaining unit." Hence, they must be "outside said bargaining unit."
But the paragraph doesn't bar just anyone "outside said bargaining unit" from doing work reserved for the bargaining unit. It prohibits "any employee" from doing that work. The only reference "employee" can have is to employment by the State. If "employee" were to have any other reference, the work would then be performed by what is referred to as a "sub-contractor" in Article 33 of the CBA.
The State argues that regarding prisoners of the State as employees of the State is irrational because it defies common sense, defies the law, defies prior arbitration awards on the subject, and is not supported by any reference to the CBA. It also argues that the award violates the public policy of the State in establishing work release programs to aid the rehabilitation of incarcerated convicts.
The union counters that the arbitrator's conclusion that "employee" in paragraph 38.1 included prisoner labor was logical and supported by the evidence and that the legal authorities cited by the State are not pertinent. It further contends that banning prisoner labor from doing union work does not frustrate any public policy regarding the rehabilitation of convicts.
Virtually every court or administrative agency, which has considered the question in other contexts, has held that prisoners who provide services for the government which imprisons them are not employees of that government. Spikes v. State,458 A.2d 672 (R.I. 1983) (Workers compensation); Vanskiles v. Peters,974 F.2d 806, 807 (7th Cir. 1992), Miller v. Dukakis, 961 F.2d 7, 9 (10th Cir. 1992) (Fair labor standards), but cf. Watson v.Graves, 909 F.2d 1549 (5th Cir. 1990) (Prisoners are "employees" of private work-release employers under Fair Labor Standards Act); Speedwork Products and United Steelworkers of America, 151 L.R.R.M. (BNA) 1297 (1995) (National Labor Relations Board does not regard prisoners as "employees" even of work-release employers); see also Equal Employment Opportunity Commission Opinion 86-7, 40 FEP Cases 1892 (1986) (Prisoner laborer is not an employee of prison under Title VII); but cf. Baker v. McNeilIsland Corrections Center, 859 F.2d 124, 128-29 (9th Cir. 1988) (Prison inmates could be employees under Title VII). Some of these holdings illustrate the different status of a prisoner working in or for the prison, on the one hand, from that, on the other hand, of a prisoner working outside the prison for a private employer on work release. The one is practically never an "employee"; the other sometimes is. None of these findings provide much guidance where prison labor is "loaned" by the prison to other State agencies. While the arbitrator was not required to consider this body of legal authority, the rationality of her conclusions may be impugned by her failure to consider the problem.
The arbitrator's rationality is seriously strained by this observation:
 The State also relies upon Arbitrator Dolan's interpretation of the disputed non-bargaining unit performance language, along with citations from AAA Case No. 1139-1831-83 (Arbitrator John Van Dorr, III) and AAA case No. 1039-0087-84 (Arbitrator Mark Grossman) who suggest that the term "employee" as used in Article 38 refers to "employees of the employer". As I read Article 38, such a narrow view leads to an absurd result. Arbitrator Dolan argues that prison inmates are not "employees" in the traditional sense due to their failure to receive a fair wage for their work, but are instead part of a rehabilitation program. I would suggest that the term "employee" is also reasonably defined by the supervision of the individual. In this case, prison inmates receive their direction from the State of Rhode Island through the DOC while performing the tasks in question and therefore the work being performed is subject to the scrutiny of Article 38. To limit the parties' agreement only to State employees outside the bargaining unit leads to the potential absurd result of permitting the State to assign work normally reserved for Council 94 members to individuals who are unemployed or employed outside of State service. This is precisely the safeguard contemplated by the clear and unqualified language of this provision."
 Arbitration Opinion and Award, AAA Case No. 10-390-0144-93, December 28, 1995 at p. 29. (hereinafter simply "Award)".
The Supreme Court did not find "absurd" an argument clearly analogous to that made by the State in this case in Rhode IslandPublic Telecommunications Authority v. Rhode Island State LaborRelations Board, 650 A.2d 479, 489 (R.I. 1994):
 In addition, arbitration awards in this state have ruled that individuals who are involved in training programs are not state employees for collective-bargaining purposes. In In re State of Rhode Island Department of Social and Rehabilitative Services and Rhode Island Council 94, AFSCME, Local 2882, Case No. 1139-1393-83 (1984) (Fallon, Arb.), the union contended that the state had violated a contract provision that precluded non-bargaining-unit employees from performing non-bargaining unit work. The arbitrator concluded that the trainees involved in the WIN program were not "employees" within the meaning of the contract and noted that the trainees were "not hired through regular hiring procedures receive[d] no standard fringe benefits and [were] paid * * * an amount so small that it cannot reasonably be called a salary comparable to [s]tate employee wages." Id. at 11. Every aspect of the arbitrator's reasons for classifying the WIN trainees as nonemployees can be accurately applied to Parks and Plushner, irrespective of whether they were called associate producers."
Was the Supreme Court "absurd" to conclude that trainees were not employees of the State?
In testing the rationality of the arbitrator's conclusion that prisoners who work for the State are its "employees", it is necessary to explore the use of language in a document like the CBA. Unless the word "employee" has a clandestine or esoteric meaning known only to the parties, it is hard to conceive of that word ever being used to describe the relationship between the State and its convict prisoners. It is even harder to believe that the parties meant to include prisoners in the meaning of "employee", when, at the time the CBA was negotiated, prisoners had been laboring for the State for generations. See Anderson v.Salant, 38 R.I. 463, 475-76 (1916). In addition, the problem of displacement of bargaining unit workers by prison laborers had been considered at least since 1980 with varying results in grievance resolutions and in arbitration. No arbitrator or State grievance resolver has ever, until this case, found prisoners to be employees of the State. In spite of these recurring problems, the union has never successfully sought expressly to preclude the use of prisoners to do bargaining unit work in a CBA.
This Court concludes that no reasonably literate person would seriously choose to use the word "employee" in the English language to describe the status of three-dollar-per-day prisoners laboring involuntarily for the State.
The union argues, nevertheless, that in this particular CBA, the parties intended that prisoners be considered as if they were State employees when they do bargaining unit work. That intent is discerned in some grievance resolutions, they say, in the 1980's. In 1980, a state hearing officer ordered that two prisoners working in the Ladd School storeroom be transferred to other work, so that regular state employees could do the work on overtime. In another grievance resolution in 1989, a state hearing office ordered the state to cease and desist from using inmates to fill potholes on the grounds of state buildings. The arbitrator, however, adverted to these grievance resolutions not to uncover an undisclosed intent of the parties that prisoners were employees, but rather to buttress her conclusion that prisoners were doing work normally performed by bargaining unit employees.
In fact, most of the contention at the arbitration hearing and most of the opinion of the arbitrator is concerned with the issue of whether or not prisoner labor was displacing union work. The arbitrator concluded it was, and with that conclusion no argument is made by the State to this Court.
The question is not whether prisoners are doing union work. They are. The question is whether they can rationally be considered employees of the State under the CBA. They cannot. The arbitrator did not find as a fact that the parties intended to include prisoners as employees under the CBA. They didn't.
The analysis of the award is not at an end. There is another provision of the CBA designed principally to preserve union work. Article XXXIII limits the State's authority to sub-contract union work. Paragraph 33.1 commits the State to avoid, "insofar as is practicable," the sub-contracting of bargaining unit work. The paragraph plainly does not prohibit sub-contracting. Paragraph 33.2 does commit the State to notifying and consulting with the union's executive director, before it sub-contracts "any work presently performed by an employee which would have an adverse affect (sic) upon job security, wage rate, or classification status of any employee in the bargaining unit."
It appears that some of the grievances resolved in the 1980's treated prisoner labor as sub-contract work and found that the convict labor did or did not have the specified adverse effect on union work. In passing, the arbitrator in this case observed:
 "In the instant matter, the record indicates that certain job transfers, layoffs and vacant positions resulted from the state's action to place inmates at job sites within the State. Certainly (!) these actions resulted in an adverse impact upon members of the bargaining unit and the State was in violation of this provision by failing to communicate with the Union." Award, p. 28.
Neither the arbitrator in her decision, nor the parties on these motions, have analyzed the question of whether or not use of prison labor in work at State facilities outside of the Department of Corrections is "sub-contracting." Accordingly, it is not necessary for this Court to decide whether prison labor is sub-contract work subject to Article XXXIII and whether the State has violated that provision of the CBA.
Finally, the State has argued that, if the CBA prohibits the use of prison labor outside the ACI by state agencies, the CBA will somehow violate public policy articulated and defined in G.L. § 42-56-21. It argues that such a prohibition will "dramatically" limit the director of correction's power to place prisoners at hard labor outside the ACI.
The director's power to keep or let prisoners at hard labor in the ACI or on its grounds is not involved in this case. All of the work discussed in this arbitration was performed for agencies other than the department of corrections and outside of the ACI and off its grounds. Nothing in § 42-56-21 requires that the director place any inmate in any particular employment in a work release program. The director would probably be remiss in the exercise of discretion if no prisoners were placed anywhere to work off the prison grounds. Any provision in any CBA between a state department director and a union of state employees in the department limits the director's powers to administer and manage the department.
All that Vose v. Rhode Island Brotherhood of CorrectionalOfficers, 587 A.2d 913 (R.I. 1991), holds is that because of "the exigencies incident to running a correctional institution", the power and duty of the director to provide for adequate security at the ACI could not be limited by a provision of a CBA. As this Court has said before, the State is not only an employer, it is also a government. It cannot be allowed to bargain away its obligation to govern in the public interest. The danger of an insecure ACI because the director could not require involuntary overtime by correctional officers is so obvious as not to need further elaboration. That emergent danger is not the same as the difficulty the director might encounter from the minor inconvenience of not being able to place inmates in off-grounds work for other state agencies in the exercise of the director's discretion under § 42-56-21. The arbitration award, even if it were otherwise appropriate, does not violate any law or clearly defined public policy of this State.
The Court is aware that there is a clash between the collective bargaining representative's obligation to its dues-payers to preserve their livelihood and the State's obligation to try to rehabilitate its prisoners and ease the burden of the cost of government on its taxpayers. The resolution of that clash does not belong in strained arbitration. It belongs in the negotiation of collective bargaining agreements by the State and the union or in amendment of the general laws by the general assembly. In those processes, the public's interests along with all the others will be more readily asserted than they can be in the arbitration process.
For all the foregoing reasons, the State's motion to vacate the arbitrator's award will be granted; and the plaintiff's motion to confirm the award will be denied. The State will present a judgment for entry on reasonable notice to the plaintiff.